# 10-0538-cv

*UNITED STATES COURT OF APPEALS*

*FOR THE SECOND CIRCUIT*

LINDA GRANT WILLIAMS,

APPELLANT,

vs.

CITIGROUP, INC. AND CITIGROUP GLOBAL MARKETS, INC.,

APPELLEES

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## APPELLANT'S OPENING BRIEF

Lee A. Weiss
BROWNE WOODS GEORGE LLP
49 West 37th Street, 15th Floor
New York, New York 10018
Tel 212.354.4901
Fax 212.354.4904

Michael A. Bowse
BROWNE WOODS GEORGE LLP
2121 Avenue of the Stars, Ste 2400
Los Angeles, California 90067
Tel 310.274.7100
Fax 310.275.5697

Attorneys for Appellant Linda Grant Williams

# 10-0538-cv

## *UNITED STATES COURT OF APPEALS*

## *FOR THE SECOND CIRCUIT*

LINDA GRANT WILLIAMS,

APPELLANT,

vs.

CITIGROUP, INC. AND CITIGROUP GLOBAL MARKETS, INC.,

APPELLEES

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## **APPELLANT'S OPENING BRIEF**

Lee A. Weiss
BROWNE WOODS GEORGE LLP
49 West 37th Street, 15th Floor
New York, New York 10018
Tel 212.354.4901
Fax 212.354.4904

Michael A. Bowse
BROWNE WOODS GEORGE LLP
2121 Avenue of the Stars, Ste 2400
Los Angeles, California 90067
Tel 310.274.7100
Fax 310.275.5697

Attorneys for Appellant Linda Grant Williams

## CORPORATE DISCLOSURE STATEMENT

Plaintiff Linda Grant Williams is an individual for whom no corporate

disclosure statement is required pursuant to Rule 26.1

# TABLE OF CONTENTS

Page

Jurisdictional Statement ................................................................9

Statement of Issues Presented .......................................................9

Statement of the Case .................................................................10

Statement of Facts .....................................................................13

    A.  The Parties .......................................................................13

    B.  Summary of Relevant Facts and Procedural History ..................13

        1.  Facts Presented to The District Court .................................13

        2.  The District Court Grants Defendants' Motion To Dismiss With Prejudice and Without Leave To Amend ...........................27

        3.  Plaintiff Sought Leave To Amend, But Leave Was Refused ..............29

Summary Of The Argument ...........................................................31

Argument ..................................................................................31

    I.  THE DISTRICT COURT ERRED WHEN IT CONCLUDED THAT PLAINTIFF'S ORIGINAL COMPLAINT FAILED TO ALLEGE FACTS SUFFICIENT TO STATE ANY CLAIMS FOR RELIEF ...........31

    II.  EVEN IF ADDITIONAL FACTS WERE REQUIRED TO SATISFY RULE 8(a), DISMISSAL OF THE ORIGINAL COMPLAINT WITHOUT LEAVE TO AMEND WAS IMPROPER ..............................36

    III.  THE DISTRICT COURT'S ORDER DISMISSING PLAINTIFF'S STATE LAW CLAIMS WITH PREJUDICE SHOULD BE REVERSED ...................................................................42

CONCLUSION ...........................................................................49

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007) ................................................... 11,20,27,28,35,40,46,47

*Brzak v. United Nations,*
    597 F.3d 107 (2nd Cir. 2010) ........................................................ 44

*Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.,*
    454 F.2d 1292 (2nd Cir. 1972) ........................................................ 45

*Carnagie-Mellon University v. Cohill,*
    484 U.S. 343 (1988) ........................................................ 42

*Ciralsky v. C.I.A.,*
    355 F.3d 661 (D.C. Cir. 2004) ........................................................ 38

*Cortec Industries, Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2nd Cir. 1991) ........................................................ 37

*Donald v. Cook County Sheriff's Dept.,*
    95 F.3d 548 (7th Cir. 1996) ........................................................ 38

*E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc.,*
    ___ F. Supp. 2d ___, 2009 WL 2762614 (E.D. Va. Aug. 27, 2009) ............. 20

*Foman v. Davis,*
    371 U.S. 178 (1962) ........................................................ 37

*Giordano v. City of New York,*
    274 F.3d 740 (2d Cir. 2001) ........................................................ 12

*Guggenheimer v. Ginzburg,*
    43 N.Y.2d 268 (1977) ........................................................ 48

Page

*In re Elevator Antitrust Litig.*,
   502 F.3d 47, 52 (2nd Cir. 2007) ................................................................. 31

*Iqbal v. Ashcroft*,
   129 S.Ct. 1937 (2009) ................................................................. passim

*Kolari v. New York-Presbyterian Hosp.*,
   455 F.3d 118 (2nd Cir. 2006) ................................................................. 10,45

*LeBlanc v. Cleveland*,
   248 F.3d 95 (2nd Cir. 2001) ................................................................. 37

*Lynch v. Suffolk County Police Dept., Inc.*,
   348 Fed.Appx. 672 (2nd Cir. 2009) ................................................................. 18,19,20,44

*Marcus v. ATT Corp.*,
   138 F.3d 46 (2d Cir. 1998) ................................................................. 12

*Murphy v. General Motors Corp.*,
   55 A.D.2d 486 (1977) ................................................................. 48

*New York State Elec. And Gas Corp. v. FirstEnergy Corp.*,
   328 Fed.Appx. 13 (2nd Cir. 2009) ................................................................. 38

*Ola, LLC v. Builder Homesite, Inc.*,
   _ F. Supp. 2d _, No. 2:08-CV-324-CE, 2009 WL 3190443
   (E.D. Tex. Sept. 29, 2009) ................................................................. 35

*Oliveira v. Frito-Lay, Inc.*,
   251 F.3d 56 (2nd Cir. 2001) ................................................................. 45

*Oliver Schools, Inc. v. Foley*,
   930 F.2d 248 (2d Cir. 1991) ................................................................. 37

*Rescuecom Corp. v. Google, Inc.*,
   562 F.3d 123 (2d Cir. 2008) ................................................................. 32

Page

*Ruffolo v. Oppenheimer & Co.*,
  987 F.2d 129 (2d Cir. 1993)......................................................... 37

*Scott Runyan Pontiac-Buick. Inc.*,
  194 W. Va. at 776, 461 S.E.2d at 522........................................... 47

*Spagnola v. Chubb Corp.*,
  574 F.3d 64, 67 (2nd Cir. 2009) ................................................. 34

*Strategic Capital Dev. Grp. V. Sigma-Tau Pharma, Inc.*,
  198 F.3d 234 (2d Cir. 1999)......................................................... 38

*Thomas v. Williams*,
  21 So.3d 1234 (Ala.Civ.App.2008) .............................................. 47

*Valencia ex rel. Franco v. Lee*,
  316 F.3d 299 (2nd Cir. 2003) ................................................. 12,43

*Volmar v. North Shore Hosp.*,
  216 Fed. Appx. 136 (2nd Cir. 2007) ............................................ 45

*Waltman v. International Paper Co.*,
  875 F.2d 468 (5th Cir. 1989)........................................................ 39

**Federal Statutes**

28 U.S.C. §1291 .............................................................................. 9

28 U.S.C. §1331 .............................................................................. 9

28 U.S.C. §1367 ............................................................................ 12

Clayton Act, 15 U.S.C. §15 ............................................................. 9

Clayton Act, 15 U.S.C. §26 ............................................................. 9

                                                                    Page

Federal Rules of Appellate Procedure 4(a)(4) ........................................ 9

Federal Rules of Civil Procedure, Rule 8 .................................. 10,12,27,36,38,41

Federal Rules of Civil Procedure, Rule 59 ........................................... 9

Federal Rules of Civil Procedure Rule 60(b) ....................................... 38

Sherman Act, 15 U.S.C. §1 ........................................................ 10

Sherman Act, 15 U.S.C. §2 ........................................................ 10

**State Statutes**

Donnelly Act, NY Gen. Bus. L. §340, et seq.) ................................... 11

## JURISDICTIONAL STATEMENT

The District Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. It granted Defendants' motion to dismiss on November 2, 2009, and entered Judgment on November 3, 2009. This appeal is from that judgment and from the District Court's February 8, 2010, order denying Appellant's timely-filed Motion for Re-Argument and Reconsideration pursuant to Fed. R. Civ. Proc. 59 and 60. The Notice of Appeal was filed on February 24, 2010. Accordingly, this appeal is timely pursuant to Fed. R. App. Proc. 4(a)(4). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1.     Whether the District Court erred when it dismissed Plaintiff's original complaint without leave to amend and with prejudice solely on the ground that Plaintiff failed to allege sufficient facts to satisfy the pleading requirements of Federal Rule of Civil Procedure Rule 8(a), particularly since the dismissal was based on pleading rules announced or clarified in *Iqbal v. Ashcroft*, 129 S.Ct. 1937 (2009), which was decided ***after*** Plaintiff filed her complaint and after briefing on the motion to dismiss was completed.

2.     Whether, in the event Plaintiff's original complaint did not allege sufficient facts to satisfy the pleading requirements of Federal Rules of Civil

9

Procedure Rule 8(a), the District Court erred in refusing to permit Plaintiff an

opportunity to amend, as required by *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d

Cir. 1988) (holding that it is "an abuse of discretion to deny leave to amend

when dismissing a nonfrivolous ***original*** complaint on the sole ground that it

does not constitute the short and plain statement required by Rule 8.").

     3.      Whether, in the event Plaintiff's original complaint did not satisfy

the pleading requirements of Rule 8(a), the District Court should have declined

to exercise supplemental jurisdiction over Plaintiff's New York state law claims,

as directed by *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) (if federal

claims are dismissed before trial, court should decline supplemental jurisdiction

over state law claims) and *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118

(2nd Cir. 2006) (holding District Court abused its discretion when it dismissed

supplemental state law claims with prejudice after dismissing federal claims,

rather than declining to exercise jurisdiction over them).

## STATEMENT OF THE CASE

     This is an appeal from an order by Hon. Loretta Preska dismissing, with

prejudice and without leave to amend, Plaintiff Linda Grant Williams' original

complaint against Citigroup, Inc. ("Citigroup") and Citigroup Global Markets,

Inc. ("CGM") for: (1) violations of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§1, 2, (2) violations of New York's Donnelly Act, NY Gen. Bus. L.

§340, et seq.), (3) tortious interference with contract, and (4) tortious inter-
ference with prospective economic advantage.

Plaintiff's claims pertain to an alleged conspiracy among the Defendants
and other investment banks to exclude Plaintiff from the market for Airport
Special Facility Bond financings ("ASF Bonds") by, *inter alia*, coercing other
investment banks to boycott Plaintiff's cost-saving method of financing airports
and to refuse to work with any banker assisting Plaintiff, erecting barriers to
Plaintiff's entry into the market, coercing airlines which could save millions of
dollars each year by using Plaintiff's structure to refuse to deal with Plaintiff,
and coercing two large international law firms to terminate Plaintiff's employ-
ment in order to deprive Plaintiff of a platform from which to implement her
cost-saving structure.

The District Court dismissed all of the claims, both federal and state,
alleged in Plaintiff's initial complaint, without leave to amend.  It did so based
entirely upon its conclusion that the complaint did not allege enough facts or
enough detail to satisfy Fed. R. Civ. Proc. 8(a), as construed in *Bell Atlantic v.
Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).
Although the court, throughout its opinion, recognized that the deficiencies it
identified in Plaintiff's complaint could be resolved by the allegation of
additional facts, it dismissed Plaintiff's claims with prejudice and without leave

11

to amend. Even assuming the court was correct to find that Plaintiff's initial complaint lacked details sufficient to constitute the short and plain statement required by Rule 8, it erred when it failed to allow Plaintiff even one opportunity to amend her original complaint. *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2nd Cir. 1988).

Moreover, although 28 U.S.C. §1367 gives district courts discretion whether to exercise supplemental jurisdiction after dismissing the claims that created federal jurisdiction, that discretion has its limits. *Valencia ex rel. Franks v. Lee*, 216 F.3d 299, 305 (2nd Cir. 2003). The District Court exceeded those limits here when it chose to exercise supplemental jurisdiction over Plaintiff's New York state law claims even though it dismissed Plaintiff's federal claims at the outset of the lawsuit. *Marcus v. ATT Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where federal claims are dismissed before trial, the state claims should be dismissed [without prejudice] as well"). Indeed, the District Court's abuse of discretion is particularly clear given its recognition that the sufficiency of Plaintiff's claims turned on unsettled issues of state laws. See App. Tab 1, at 31 ("New York law does not precisely define 'extreme and unfair' economic pressure"); *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (state law claims dismissed without prejudice after dismissal of federal claims, since analytic framework for state claims better decided by state court).

12

# STATEMENT OF FACTS

### A.    The Parties

Plaintiff Linda Grant Williams is well-known attorney who specializes in facility financing.  Because she developed a structure which has been used for lower cost financing of professional sports arenas and is credited with developing the securitization industry for sports stadium finance, Plaintiff was named one of the 6 "Smartest Sports Executives" in the country.  Plaintiff is the creator of the invention embodied in United States patent application number US200710038537 A1 and various continuations thereof, which is the invention at issue herein.  That invention provides a low cost method and structure for financing high-volume passenger airport terminals.

Defendant Citigroup is a Delaware corporation with its principal offices in New York, New York.

Defendant CGM is a Delaware corporation with its principal place of business in New York, New York.  CGM is an indirect, wholly owned subsidiary of Citigroup.

### B.    Summary of Relevant Facts and Procedural History

#### 1.    Facts Presented to The District Court

Airport terminals, although they occupy publicly owned land, are often built and renovated by issuing municipal bonds to be repaid by the airline

tenants.  App. at 48, ¶1.[1]  Because of the substantial expense involved and in

order to attract major air carriers to their airports, municipal airport owners

assist the airlines by allowing them to issue ASF Bonds through the municipality,

thereby allowing interest income on the ASF Bonds to be tax exempt and to bear

lower interest rates than those borne by taxable bonds.  App. at 48-49, ¶2.

Because the airlines are ultimately responsible for the repayment of those

bonds and because airlines' credit ratings are poor, ASF Bonds have the unusual

distinction of paying tax-exempt interest at high rates.  App. at 49, ¶3.  That

makes conventionally-structured ASF Bonds very profitable to those who own

them.  App. at 50-51, ¶10.  On the other hand, the high interest rates that must be

paid by the airlines in connection with those bonds makes traditionally

structured ASF Bonds extremely costly to the airlines.  App. at 52, ¶14.

Plaintiff developed a financing structure that would allow ASF Bonds to

feature much lower interest rates, while remaining tax exempt.  App. at 49, ¶4.

She and her law partners at Pillsbury Winthrop Shaw Pittman, a large and well

respected international law firm ("Pillsbury"), presented her new methodology

---

[1]     All factual references to App. 48-81 are to Plaintiff's original
complaint, and reflect facts that were before the District Court on the motion to
dismiss.  References to App. 97-157 are to the Declaration of Michael A. Bowse
and Reply Declaration of Michael A. Bowse submitted in support of Plaintiff's
motion for reconsideration, and reflect facts that Plaintiff informed the District
Court could have been alleged in an amended complaint if leave to amend was
granted.

to the CGM department that handles airport finance. App. at 60, ¶44. They described how her structure worked and how it could be used to refinance outstanding high interest rate ASF Bonds at much lower interest rates. *Id.* at ¶¶49, 50. Excited about the substantial underwriting fees that his airport finance department at CGM could earn from refinancing existing ASF Bonds with Plaintiff's structure, a lead CGM underwriter, Neal Attermann, remarked "We are going to mint money on this idea! Thank you!" *Id.* at ¶51.

However, that banker's attitude changed after other, more senior members of CGM became aware of Plaintiff's groundbreaking structure. *Id.* David Brownstein, the head of Municipal Derivatives at CGM, was informed of Plaintiff's structure by Plaintiff's CGM client, Jeff Heckman, and quickly realized the adverse effect that structure would have on ASF Bond interest rates, trading volatility and on CGM's municipal derivatives business. App. at 63, ¶61; App. at 98-99, ¶4. Thereafter, Mr. Brownstein told other CGM employees that he did not want them to perform any ASF Bond financings or refinancings using Plaintiff's structure. *Id.* This was not because he believed the structure would not work. *Id.* On the contrary, Mr. Brownstein demonstrated his understanding that the structure would work when he insisted that key elements of Plaintiff's structure be implemented in connection with a municipal bond issuance to finance new dormitories at the University of Colorado. *Id.* Rather,

15

it was because he did not want anyone at Citibank or anywhere else to use Plaintiff's cost-saving structure.

The directive was enforced within CGM, at least in part, by firing the CGM municipal banker, Jeff Heckman, who had initially promoted Plaintiff's structure within CGM's airport finance department. App. at 63, ¶63; App. at 99, ¶7. Mr. Heckman was abruptly fired by CGM immediately after he arranged a meeting for Plaintiff and her Pillsbury partners to explain how Plaintiff's ASF Bond structure could be promoted and implemented. App. at 63, ¶63.

After Mr. Heckman was fired, his former colleague, Joel Heller, said that Plaintiff was "toxic" and that he was told that he could no longer work with her. App. at 66, ¶72; App. at 100, ¶8. Likewise, despite his initial excitement at the idea and although he promised to do so, Mr. Attermann failed to arrange meetings with CGM's major airline clients to promote the refinancing of high interest rate ASF Bonds by using Plaintiff's much less costly structure. App. at 60, ¶51; App. at 100, ¶9. Indeed, years later, when Plaintiff again discussed with Mr. Attermann the prospect of structuring ASF Bonds using her patent-pending method, he indicated his willingness to hire Plaintiff and her firm to perform legal work, but refused to work with Plaintiff on transactions using her cost saving structure even though he conceded that Plaintiff's structure was superior and would result in significant savings to airlines at high demand airports. *Id.*

16

CGM also successfully reached out to other participants in the ASF Bond market to block the implementation of Plaintiff's structure. First, CGM attacked Plaintiff directly. When Plaintiff was a partner at Pillsbury, Mr. Brownstein demanded of Michael Schumaecker, national head of Pillsbury's Financial Institutions practice group, that Pillsbury withdraw its application to patent Plaintiff's ASF Bond structure, even though he had no valid reason to make that demand (for example, Citigroup disclaimed any ownership of the idea). App. at 63, ¶64; App. at 99, ¶5. Then, after Plaintiff left Pillsbury and joined Greenberg Traurig, Mr. Brownstein contacted Richard Rosenbaum, then Greenberg Traurig's managing partner, to demand that Greenberg fire Plaintiff in order to deprive Plaintiff of a platform from which she could credibly promote the use of her cost saving airport structure. App. at 64, ¶66; App. at 99, ¶6.

Then, Citigroup colluded with other investment bankers to erect additional barriers to Plaintiff's entry into the ASF Bond market and to bar any use of her structure. In negotiated ASF Bond issuances, as in other bond issuances, the issuer typically selects a lead bank to manage the underwriting of the bonds. App. at 102, ¶18. That lead bank then selects other banks to form a syndicate of banks to participate in underwriting the bond issuance. *Id.* Forming syndicates of underwriting banks is necessary because it expands the base of customers to

17

whom the bonds can be sold, thereby insuring the success of the issuance, and it spreads the risk of the issuance among multiple underwriters. *Id.*

The syndication of negotiated ASF Bond issuances also provides an opportunity to enforce conspiracies. There is no requirement that any particular bank be allowed to participate as a member of the syndicate. App. at 102, ¶19. Thus, only those banks which are selected by the lead managing bank to participate in the syndicate can profit from underwriting the ASF bond issuance. *Id.* By selecting particular banks for the syndicate and failing to select other banks, the managing bank can spread or deny rewards among other banks which participate in the municipal bond market generally and the negotiated ASF Bond market specifically. *Id.*

Citigroup has a 73% share of the market for ASF Bond issuances. App. at 66, ¶74. Since Plaintiff developed her patent-pending structure, CGM has been a manager of at least 14 ASF bond issuances. App. at 103, ¶22. It has selected as members of the underwriting syndicate Morgan Stanley in 9 of those 14 issuances, JP Morgan in 5, Goldman Sachs in 5, Samuel A. Ramirez & Co., Inc. in 6, Bear Stearns in 5, UBS in 5 and Merrill Lynch in 1. *Id.*. Other banks who have participated with Citigroup in syndicates include Lehman Brothers and Bank of America. *Id.*

18

Underwriting syndicates led by CGM have caused bond issuances completed after Plaintiff's structure became known to them to include long "no call" features that would prevent them from being refinanced using Plaintiff's structure for many years. App. at 64-65, ¶¶68-70. In November of 2005, Citigroup, Merrill Lynch & Co., Goldman Sachs & Co., JPMorgan, Morgan Stanley, UBS Financial Services Inc., Bear Stearns & Co., Inc. and Ramirez & Co., Inc. were co-underwriters on a tax exempt $800,000,000 ASF Bond issuance for American Airlines' terminal at JFK Airport. App. at 103, ¶22. That bond issuance included a long 11 year "no call" period, i.e., the period during which the bonds cannot be refinanced without a penalty. That 11 year period prevents Plaintiff's structure from being used to refinance those bonds at lower interest rates until 2016. App. at 64, ¶69. Similarly long no-call periods were included in (1) the $108,675,000 bond issuance to finance American Airline's terminal at Chicago O'Hare co-underwritten by Citigroup, Alta Capital Group, LLC, RBC Capital Markets and SBK-Brooks Investments Corp., (2) the $131,735,000 ASF Bond for American Airlines terminal at Dallas Fort Worth airport co-underwritten by Morgan Stanley, Merrill Lynch & Co., Ramirez & Co., Inc. and Siebert Brandford Shank & Co., LLC, and (3) a $270,025,000 ASF

19

eased

Bond issuance for United Airlines terminal at Denver International Airport co-underwritten by Citigroup and Morgan Stanley. App. at 103, ¶22.[2]

Direct pressure was also placed on other bank airport underwriters not to work with Plaintiff or use her cost saving methodology. App. at 51, ¶12(d). Until its acquisition of Merrill Lynch, Bank of America was a small player in the market for ASF Bond issuances, but sought to gain a larger share of the market. App. at 104, ¶23. To that end, in August 2007, after months of negotiations and many hours of investigation, Bank of America entered into an exclusive two-year agreement with Plaintiff to license the use of her patent pending structure. *Id.* That license should have been extremely advantageous to Bank of America because the licensing arrangement cost Bank of America nothing until a bond issuance was actually completed using Plaintiff's structure. *Id.* Moreover, because Plaintiff's structure would result in much lower interest rates than traditionally structured ASF Bond transactions, the exclusive license gave Bank

---

[2] This allegation should be enough by itself to plead a unilateral monopolization claim after *Twombly*. In *E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc.*, ___ F. Supp. 2d ___, 2009 WL 2762614 at *14 (E.D. Va. Aug. 27, 2009), the district court considered whether allegations that (1) DuPont entered into a number of long-term supply agreements, (2) had market dominance (exceeding 70%), and (3) the effect of the agreements was to preclude the plaintiff from entering the market, were sufficient to support a monopolization claim. The *DuPont* Court determined that the allegations were sufficient to survive a motion to dismiss because such long term agreements would have the effect of excluding the plaintiff from the market, thereby enabling DuPont to preserve its monopoly.

of America a competitive advantage over other banks in the ASF Bond market. *Id*.

However, just 8 months after signing the license, John Coan of Bank of America and his superior, Kimberly Papparello, told Plaintiff that Bank of America wanted to cancel the license. *Id*. at ¶24. They told Plaintiff that Bank of America was suffering "reputation risk" among the investment banks with whom it ordinarily co-underwrites bond offerings (a group that is overwhelmingly dominated by CGM) due to its licensing agreement with Plaintiff. *Id*. In that context, "reputation risk" referred to the treatment that Bank of America would receive from other banks in the municipal bond market if it continued to work with Plaintiff or use her cost saving methodology. *Id*.

There was no reason for Bank of America to seek cancellation of its licensing arrangement with Plaintiff other than due to pressure from CGM and other investment banks active in ASF Bonds, as the licensing arrangement was cost-free to Bank of America until a bond issuance was completed using Plaintiff's structure. *Id*. Moreover, because Bank of America did not then itself have substantial proprietary ASF Bond holdings, it could not have been motivated by a self-serving, non-conspiratorial desire to preserve high interest rates on ASF Bonds. *Id*. However, Bank of America knew that even if it succeeded in using the pricing advantage for airlines that Plaintiff's ASF Bond

structure afforded as a means to be appointed the lead manager of an ASF Bond issuance, it could not successfully sell an ASF Bond issuance without forming a syndicate that included CGM and the other banks who regularly co-underwrite ASF Bonds with CGM.  App. at 105, ¶26.

That Bank of America was pressured by CGM and its co-conspirators is reinforced by statements that employees of some of those other banks made to Plaintiff and others:

- In October 2007, Ira Smelkinson, then with Morgan Stanley, in the presence of Michael Lexton, then of Bear Stearns, indicated that they were aware of Plaintiff's license with Bank of America and told her that despite that licensing agreement, no deals would be completed using her structure.  App. at 105, ¶27.  Shortly after that, Bank of America began to tell Plaintiff that its license agreement with Plaintiff was creating a "reputation risk" and that it wanted to cancel the licensing agreement it had recently entered into with Plaintiff.  App. at 104, ¶24.

- In May 2009, Ben Djiournas at J.P. Morgan Securities refused to work with Plaintiff regarding the use of an adaptation of her structure at a seaport, even though J.P. Morgan's client, Centerpoint Properties ("Centerpoint"), asked that the J.P. Morgan bankers do so.  App. at 105, ¶28.   Michael Lexton (who participated in the October 2007 conversa-

tion taunting Plaintiff that her license with Bank of America would not result in any ASF Bond issuances) now heads the group at JP Morgan that directly refused its client's explicit request to meet with Plaintiff. *Id.*

- In 2009, Jeff Holt, formerly of Goldman Sachs and now with BOM Capital, derided Plaintiff for her continuing efforts to promote her structure and told her that neither he nor any other industry participant would allow her to get "any traction" on her cost saving structure. App. at 106, ¶29.

- In the summer of 2009, Steve Howard of Barclays Capital (and who is a former employee of Lehman Brothers) told bankers at a boutique investment bank with whom Plaintiff was then working not to work with Plaintiff or use her structure to restructure ASF bond issuances to lower the interest rates paid by airlines because there would be too much "hair" on those deals and on any other deal in which Plaintiff is involved. *Id.* at ¶30. In this context, "hair" referred to the fact that other banks would refuse to participate in any underwriting syndicate for a bond issuance that involved Plaintiff and her cost saving structure and would punish the managing bank on that issuance by excluding it from other bond issuances. *Id.*

- Steve Howard also told a mid-level employee of that boutique

23

investment bank that, if he pursued ASF Bond issuances using Plaintiff's structure, it could negatively affect his ability to ever be employed with another investment bank. *Id.* at ¶31.

That Citigroup at least participated in this conspiracy is made plausible by several facts. Not the least of those is that David Brownstein, head of CGM's Municipal Derivatives Group (whom Plaintiff has never met), called two large international law firms for whom Plaintiff was working to insist that they not permit Plaintiff to promote her ASF Bond structure and that they terminate their employment relationships with her. *Supra* at 9. Moreover, Citigroup has sub-stantial incentives to participate in a conspiracy. Citigroup's unilateral refusal to deal with Plaintiff would not be effective to protect Citigroup's interests in dominating the market for ASF Bonds. Because Plaintiff's structure will result in substantially lower interest rates than traditionally structured ASF Bonds, once the first ASF Bond issuance is completed using Plaintiff's structure, all subsequent issuances at high demand, origin and destination airports will have to use her structure as well. App. at 52, ¶14; App. at 101-02, ¶17. This is because no tax attorney will be able to supply an opinion, as required by the IRS for all tax-exempt bonds, that high-interest rate ASF Bonds reflect arms-length, market rates. *Id.* Thus, in order to protect its 73% dominant market share in ASF Bonds, Citigroup had to ensure that Plaintiff would never be able to use her

structure to save airlines and airports hundreds of millions of dollars in interest expenses.

Parallel conduct at other investment banks which frequently underwrite ASF Bond issuances further indicates the existence of the conspiracy at issue here. Citigroup and CGM were not the only banks whose municipal bond underwriting groups initially provided Plaintiff's structure to airlines and municipalities, only to stamp out those employees' enthusiasm once word reached more senior levels of the companies. Taking a page out of Citigroup's playbook, both Goldman Sachs and JP Morgan Securities either fired or reassigned employees who promoted the use of Plaintiff's ASF Bond structure to airlines. App. at 66, ¶73(a). Thus, Mike Tierney at Goldman Sachs abruptly took an early retirement shortly after he began to promote Plaintiff's ASF Bond structure to Goldman Sach's airline clients. App. at 100, ¶11. Similarly, Crystal Mullins of J.P. Morgan Securities was swiftly transferred from the firm's Municipal Transportation division to its Asset Management unit even though she was well-respected and had worked in the municipal transportation sector for over 15 years. App. at 100-01, ¶12. Ms. Mullin's transfer came imme-diately after she distributed proposals to refund US Air's terminal at La Guardia airport in February 2007. *Id.* After Ms. Mullins' transfer, her replacements –

Kevin Carney and Marshall Kitain – cut off all contact with Plaintiff and abruptly abandoned the proposal that Ms. Mullins had made to US Air. *Id.*

The admitted existence of a conspiracy to restrain trade in the municipal bond market generally also lends plausibility to Plaintiff's allegations here. The market for ASF Bond issuances is a subset of the larger municipal bond market. Indeed, ASF Bonds are municipal bonds. App. at 54, ¶28. They exist as a specialized subset of the municipal bond market because of their unique features. App. at 54-55, ¶¶27-30.

In October 2009, the United States Department of Justice indicted several participants in the municipal bond market for participating in a conspiracy to fix prices and rig bids in that market. App. 107-112, ¶¶33-45; App. at 262, ¶2. That indictment was built largely upon Bank of America's admissions regarding the existence and operation of that conspiracy, received in exchange for acceptance into the Department of Justice Antitrust Division's Corporate Leniency Program. App. at 107, ¶33. A former employee of Bank of America and who has cooperated with the City of Los Angeles in its own investigation into the municipal bond market conspiracy has confirmed the existence of this conspiracy and described how it worked. App. at 107-08, ¶36. The co-conspirator banks agreed to divide municipal bond transactions among themselves. *Id.* They accomplished this by pre-selecting which co-conspirator bank would win the

26

"competition" for a particular municipal bond transaction by communicating both directly amongst themselves and by communicating with brokers who administered the "competition" for the bond transactions. *Id.*

Citigroup participated in this conspiracy and, among other things, obtained as its reward control over a municipal bond transaction for the City of San Mateo, California at a price that was several million dollars higher than it would have been in the absence of a conspiracy. App. at 110-11, ¶44.

> ## 2. The District Court Grants Defendants' Motion To Dismiss With Prejudice and Without Leave To Amend

On November 2, 2009, the District Court granted Defendants' motion to dismiss Plaintiff's original complaint. According to the court, Plaintiff's original complaint failed to include enough factual heft to satisfy the requirements of Rule 8 as announced in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and both refined and expanded in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).

With respect to Plaintiff's claims under Section 1 of the Sherman Act, the Court held that "Plaintiff's allegations do not include evidentiary facts that could allow me to plausibly infer a conspiracy." App. at 10. According to the District Court, "Absent further facts supporting an agreement, Plaintiff's allegations fail to state a claim against Defendants for conspiring with other banks." App. at 15.

Implicit in that statement of the grounds for dismissal is an understanding that a claim for relief might be stated if "further facts" were alleged. Nevertheless, the District Court dismissed all of Plaintiff's claims (both federal and state law) with prejudice and without leave to amend. *Id.* The District Court entered judgment against Plaintiff the next day. App. at 34.

With respect to Plaintiff's claims under Section 2 of the Sherman Act, the District Court held that it was not enough for Plaintiff to allege that Citigroup's refusal to deal with Plaintiff was done for the purpose of monopolization and lacked a legitimate business purpose, because Plaintiff had not also alleged that Citigroup terminated a prior course of dealing with Plaintiff. App. at 21-22. (In fact, Plaintiff did allege a prior course of dealings. *Infra,* at 23-24.)

Although its order resolved Plaintiff's federal law claims early in the litigation and before any discovery, the District Court exercised jurisdiction over Plaintiff's state law claims, only to also dismiss those claims with prejudice.. The court dismissed Plaintiff's state antitrust claims on ground that the elements of a claim under the Donnelly Act are the same as those for a claim under the Sherman Act and that, since Plaintiff's allegations were insufficient to satisfy *Twombly* and *Iqbal*'s requirements for pleading a claim under the Sherman Act, they were also insufficient to state a claim under the Donnelly Act. App. at 26-27. The District Court also dismissed Plaintiff's state law tortious interference

28

claims on the grounds that (i) because Plaintiff's antitrust claims were insufficient, the complaint did not allege an independent crime or tort, and (ii) Plaintiff's assertion that Citibank threatened to deprive Pillsbury and Greenberg Traurig of millions of dollars in attorneys fees by removing them from its approved counsel worldwide if they did not fire Plaintiff was not "extreme or unfair" economic pressure. App. at 31.

Inexplicably, despite its own recognition that the allegation of additional facts would cure these perceived deficiencies, the District Court did not permit Plaintiff an opportunity to amend her complaint, but instead dismissed all of Plaintiff's claims with prejudice. The court entered judgment against Plaintiff the next day. App. at 37.

### 3.    Plaintiff Sought Leave to Amend, But Leave Was Refused

On November 17, 2009, Plaintiff moved pursuant to Federal Rules of Civil Procedure 59 and 60 for reconsideration and/or reargument of the order dismissing her claims with prejudice, and requested that the District Court, at a minimum, grant leave to file an amended complaint alleging the "further facts supporting an agreement" that the District Court found missing from the original complaint. Motion for Reargument and Reconsideration, filed November 17, 2009 (Docket Nos. 28-30). In her motion and an accompanying declaration,

Plaintiff identified numerous additional facts and details that were not alleged in the original complaint, but which could be alleged in an amended complaint, including:

- The names of the various individual participants in the events at issue and the identifies of Citigroup's co-conspirators. App. at 98-104, ¶¶3-22.

- Admissions by Bank of America regarding the existence of an illegal conspiracy to restrain trade in the municipal bond market that involved, among others, Citigroup, which conspiracy existed at the time Plaintiff was being excluded from the market. App. at 107-112, ¶¶33-45;

- Statements made by employees of CGM, Morgan Stanley, Bear Stearns, and Goldman Sachs (who regularly underwrite ASF Bonds with Citigroup) to the effect that no deal using Plaintiff's structure would or should be done because no bank would or should participate in an ASF Bond issuance that involved her structure. App. at 105-106, ¶¶27, 29;

- Threats by banks whom CGM regularly includes in underwriting syndicates for ASF Bond issuances to non-syndicate banks with whom Plaintiff was working that those non-syndicate banks that they would be punished if they continued to promote Plaintiff's ASF Bond structure and that the individual employees of those non-syndicate banks would be blackballed from employment with syndicate banks. App. at 106, ¶¶30-31; and

- Facts demonstrating the importance to Citigroup and CGM that no other bank permit the use of Plaintiff's structure in connection with any ASF Bond issuance or refinancing.  App. at 101-02, ¶17.

## SUMMARY OF THE ARGUMENT

The District Court erred when it dismissed Plaintiff's claims with prejudice and without leave to amend.

## ARGUMENT

### I.  THE DISTRICT COURT ERRED WHEN IT CONCLUDED THAT PLAINTIFF'S ORIGINAL COMPLAINT FAILED TO ALLEGE FACTS SUFFICIENT TO STATE ANY CLAIMS FOR RELIEF

As an initial matter, the District Court overlooked or ignored several critical allegations in Plaintiff's original complaint when it granted Defendants' motion to dismiss.

Thus, the District Court dismissed Plaintiff's claim under Section 2 of the Sherman Act on the ground that a monopolists' refusal to deal is not enough to state a claim under Section 2 of the Sherman Act unless the plaintiff also alleges that the monopolist terminated a prior dealing with the plaintiff.  App. at 21-22 (citing *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2nd Cir. 2007).  However, in its ruling the Court ignored that Plaintiff *did allege that Citigroup terminated a prior course of dealing with Plaintiff*.  The original complaint describes that

Citigroup's Municipal Derivatives Group initially worked with Plaintiff to promote ASF Bond issuances using her structure, including by promoting Plaintiff's structure to Citigroup's airline clients (App. at 60, ¶51; App. at 63, ¶63), then refused to deal with Plaintiff after news of her structure reached members of Citigroup management who were responsible for aspects of Citigroup's business other than ASF Bond underwriting.  App. at 63, ¶63.

The District Court dismissed Plaintiff's antitrust conspiracy claims under Section 1 of the Sherman Act on the ground that Plaintiff had not alleged facts sufficient to make the existence of a conspiracy plausible . In particular, the District Court concluded that there was a non-conspiratorial explanation for the refusal of banks other than CGM to deal with Plaintiff.  Specifically, the court concluded that those banks must have been acting in their own self-interest when they refused to deal with Plaintiff, rather than pursuant to a conspiracy with Citigroup.  App. at 14.  As an initial matter, such a conclusion can be drawn on a motion to dismiss, where all inferences are to be made in favor of Plaintiff and factual issues are not to be resolved.  *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2008).  The complaint certainly does not allege that Citigroup's co-conspirators were acting in their own pro-competitive economic self interest.  The complaint alleged that Citigroup was motivated to exclude Plaintiff from the market in part by its desire to protect the millions of

dollars in yearly profits it earned from underwriting ASF Bonds, trading ASF

Bonds in the secondary market and selling derivative products linked to ASF

Bonds.  App. at 62, ¶¶57-58.  However, the complaint did not allege that Bank

of America[3] or other unnamed bank co-conspirators derived profits from ASF

Bonds in the secondary market.  *See* App. at 50-51, ¶10 (alleging only that ASF

Bonds earn profits for Citigroup and "other Wall Street Banks.").  Moreover, the

complaint did not allege that, Citigroup's co-conspirators earn profits in the

secondary ASF Bond market that exceed the underwriting fees they could earn

in the event they agreed to use Plaintiff's structure and thereby displaced

Citigroup as the dominant underwriter of ASF Bonds.  In the absence of such

allegations, there was no basis for the District Court to conclude that it is

implausible that other banks were acting pursuant to a conspiracy, rather than

their own economic self-interest when they boycotted Plaintiff.

The District Court also dismissed Plaintiff's Section 1 claims on the basis

of its conclusion that the complaint did not adequately allege that the airlines

who would benefit from the use of Plaintiff's structure were coerced to

participate in a vertical conspiracy to exclude her from the market.  App. at 17.

According to the court, although the original complaint alleged that the airlines

_____

[3] In the original complaint, Bank of America was referred to only as a "prominent investment bank".  It was identified by name in connection with Plaintiff's motion for reconsideration.  App. at 104, ¶23.

depend upon Citigroup and the co-conspirator banks for operating capital (App. at 66-67, ¶¶75-79, thereby giving Citigroup and its co-conspirators leverage over the airlines to coerce them to participate in the boycott, there was no evidence that this leverage was actually exercised.  App. at 12.  That is wrong.  The complaint alleged that this leverage was exercised.  App. at 67, ¶79.  That allegation had to be accepted as true.  Moreover, the mere fact that the airlines acted against their own self interest by foregoing the use of Plaintiff's ASF Bond structure *is* evidence that this leverage was used.  It is implausible that the airlines would forego the use of a financing structure that could save them hundreds of millions of dollars iin the absence of pressure by Citigroup and its co-conspirators.  *See Spagnola v. Chubb Corp.*, 574  F.3d 64, 67 (2nd Cir. 2009) (court must "take all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor to decide whether the plaintiff has pled a plausible claim for relief").

The Court also rejected Plaintiff's Sherman Act Section 1 claim pertaining to the vertical conspiracy between CGM and Plaintiff's prior law firms.  It did so based upon its conclusion that a mere demand by CGM that Plaintiff be terminated followed by mere compliance by Plaintiff's law firm (terminating or refusing to renew Plaintiff's employment) is not enough to demonstrate a meeting of the minds between CGM and Plaintiff's former law

34

firms to achieve an unlawful objective.  App. at 17-18.[4]  However, the complaint

***did*** allege more.  Specifically, it alleged that, before it terminated Plaintiff,

Greenberg Traurig directed Plaintiff to stop marketing her ASF Bond structure

to anyone.  App. at 64, ¶66.  That instruction made no sense in the absence of

pressure from CGM.  Had Plaintiff's structure been adopted in connection with

an ASF Bond issuance while she was employed by Greenberg Traurig,

Greenberg Traurig would have earned very substantial legal fees based upon its

work on the offering.  By instructing Plaintiff to not discuss her bond structure

with anyone, Greenberg Traurig insured that no such fees would be generated.

Thus, Greenberg's order that Plaintiff stop marketing her ASF Bond structure is

strong evidence – and certainly enough to withstand a motion to dismiss – that

CGM and Greenberg Traurig agreed that Plaintiff would be terminated in order

---

[4] In its order granting the motion to dismiss, the District Court noted that
Plaintiff did not identify details about the conspiracy, such as the other parties
with whom Citigroup allegedly conspired, when the alleged conspiracy was
formed.  But neither *Twombly* nor *Iqbal* imposed a requirement that plaintiffs
alleging an antitrust conspiracy identify direct evidence of the conspiracy, like
particular meetings or communications or who participated in them.  Rather,
Plaintiff is only required to allege facts that support the ***inference*** of conspiracy.
*Ola, LLC v. Builder Homesite, Inc.*, _ F. Supp. 2d _, No. 2:08-CV-324-CE, 2009
WL 3190443, *5 (E.D. Tex. Sept. 29, 2009).  Indeed, because direct evidence of
a conspiracy is likely to exist only in the hands of the conspirators, plaintiff must
provide only "plausible grounds to infer that an agreement was made."  *Id.* at *5
(citing *Twombly*, 550 U.S. at 557)

to achieve the unlawful objective of limiting competition in the market for ASF
Bond issuances.

## II.    EVEN IF ADDITIONAL FACTS WERE REQUIRED TO SATISFY RULE 8(a), DISMISSAL OF THE ORIGINAL COMPLAINT WITHOUT LEAVE TO AMEND WAS IMPROPER

The District Court dismissed Plaintiff's *original* complaint entirely on the
ground that the complaint failed to allege sufficient facts to state a cause of action.
The court repeatedly recognized that Plaintiff could have stated a cause of action
against the defendants if she alleged additional facts. *See, e.g.*, App. at 15 ("Absent
*further* facts supporting an agreement, Plaintiff's allegations fail to state a claim
against Defendants for conspiring with other banks." (emphasis added)). Never-
theless, the court gave Plaintiff no opportunity to cure the deficiencies it identified.
That order is inconsistent with the law in this Circuit and should be reversed.

It is "an abuse of discretion to deny leave to amend when dismissing a non-
frivolous *original* complaint on the sole ground that it does not constitute the short
and plain statement required by Rule 8." *Salahuddin v. Cuomo*, 861 F.2d 40, 42
(2d Cir. 1988) (emphasis added).  While the decision to grant leave to amend is
reserved to the sound discretion of the district court, in exercising that discretion
"the district court is required to heed the command of Rule 15(a) to grant leave to
amend 'freely . . . when justice so requires.'" *Ruffolo v. Oppenheimer & Co.*, 987

F.2d 129, 131 (2d Cir. 1993) (per curiam); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).  Indeed, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.  Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991).

In many cases, leave to amend should be granted even when no request to amend was expressly made at all.  *See, e.g., Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (rejecting argument on appeal that order granting motion to dismiss without leave to amend was proper because no request to amend was made prior to order dismissing action).  In this case, the District Court declined to hold any hearing on the motion to dismiss before granting it with prejudice and without leave to amend.  Nevertheless, the District Court's opinion makes clear that the Court knew or believed Plaintiff could state claims for relief by alleging "further" facts.  App. at 15.  Given this, it was improper for the Court to refuse Plaintiff at least one opportunity to resolve any pleading deficiencies identified in the order dismissing the complaint.

To the extent a formal request is required, there are numerous examples holding it sufficient that the request to amend was made anywhere, including in a motion for reconsideration or reargument filed after the entry of judgment against the plaintiff. *See LeBlanc v. Cleveland*, 248 F.3d 95 (2nd Cir. 2001)

(holding that district court abused its discretion in denying motion to vacate judgment so that complaint could be amended to dismiss non-diverse party so federal jurisdiction would exist over claims); *New York State Elec. And Gas Corp. v. FirstEnergy Corp.*, 328 Fed.Appx. 13, 14 (2nd Cir. 2009) (district court abused discretion in denying Rule 59(e) motion that sought to amend complaint); *see also Ciralsky v. C.I.A.*, 355 F.3d 661, 674 (D.C. Cir. 2004) (reversing district court order denying Rule 59(e) motion for reconsideration made in connection with request for leave to amend where dismissal had been based on complaint's failure to satisfy Rule 8(a) and failure to allow amendment would result in final disposition of potentially meritorious claims entirely on procedural grounds); *Strategic Capital Dev. Grp. V. Sigma-Tau Pharma, Inc.,* 198 F.3d 234 (2d Cir. 1999) (reversing order denying request to replead made in motion for reargument under Fed. R. Civ. Proc. 60(b)); *Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548 (7th Cir. 1996) (reversing order denying motion for reconsideration where plaintiff sought to amend to name as defendants those individuals who caused his injuries after his action against their employer was dismissed since it appeared plaintiff could adequately allege a claim for relief and since plaintiff might have been barred from bringing claims in a separate lawsuit).

Indeed, it was particularly improper for the District Court to deny Plaintiff's request for leave to amend made in connection with her Rule 59(e) motion in this

case.  In her motion for reconsideration, Plaintiff described numerous new facts that could not have been alleged in her original complaint because they pertained to events that occurred after the original complaint was filed in October 2008 and could not have formed the basis of a request to amend in Plaintiff's opposition to the motion to dismiss, because they occurred after that briefing was completed.  *See, Waltman v. International Paper Co.*, 875 F.2d 468, 473-74 (5th Cir. 1989) (evidence is "new" if it was not available at the time original motion was opposed).  For example, Plaintiff noted that she could allege:

- In May 2009, J.P. Morgan Securities refused to meet with Plaintiff regarding the use of her structure even though its client asked that it meet with Plaintiff.  App. at 105,  ¶28.  Michael Lexton, who in October 2007 declared that Plaintiff's arrangement with Bank of America would not result in the completion of any financings using her structure, heads the group at JP Morgan that refused to meet with Plaintiff.  *Id.*

- In October 2009, Jeff Holt, formerly of Goldman Sachs and now with BOM Capital, derided Plaintiff for her continuing efforts to promote her structure and told her that neither he nor any other industry participant would allow her to get "any traction" on her structure.  App at 106, ¶29.

- In mid-2009, Barclays Capital told bankers at another investment bank not to work with Plaintiff or use her structure for ASF bond issuances

39

because (1) other banks would refuse to participate in underwriting bonds that involved Plaintiff's structure, (2) those banks would punish the managing bank on that issuance by excluding it from other bond issuances, and (3) those banks would not employ individual bankers who were involved in the issuance. App. at 106-107, ¶¶30-31.

•     On October 29, 2009, through a Department of Justice indictment, it was revealed that Bank of America has admitted the existence of a conspiracy involving Citigroup and others to restrain trade in the municipal bond market. App. at 107-112, ¶¶33-45; App. at 117, ¶2.

Moreover, the law that ultimately formed the basis for the Court's decision to dismiss Plaintiff's complaint was unsettled until *after* Plaintiff filed her complaint and even after Plaintiff opposed the motion to dismiss. *See* Nov. 3, 2009 Order at 17, n.5 ("The parties submitted their pleadings prior to the Supreme Court's decision in *Iqbal*"). It was *Iqbal* that applied the "plausibility" standard to Plaintiff's claims under Section 2 of the Sherman Act and led to the dismissal of those claims. *Id.* ("Plaintiff initially argues that the standard set forth in *Twombly* does not apply to her Section 2 claim. Under *Iqbal*, this argument fails.") This is significant because Plaintiff opposed Defendants' motion to dismiss in part based upon an argument that *Twombly* did not apply to many of Plaintiff's claims. *See* Plaintiff's Opposition to Motion To Dismiss,

40

filed January 29, 2009 ("*Twombly* was not a §2 monopolization case and there is nothing in that opinion to suggest that its discussion regarding the burdens to allege facts supporting a plausible inference that parallel conduct was conspiratorial, rather than coincidental, applies in any other kind of antitrust case")

Moreover, as the District Court noted, *Iqbal* clarified and tightened the meaning of "plausibility" for purposes of Rule 8. *E.g.*, Order at 5 ("'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting *Iqbal*, 129 S.Ct. at 1949)).

It was manifestly unjust for the District Court to dismiss plaintiff's claims with prejudice and with no opportunity to amend on the basis of a pleading standard that did not exist, or at least had not been clarified, until nearly a year after Plaintiff filed her complaint and months after Plaintiff opposed the motion to dismiss. Plaintiff should have been afforded at least one opportunity to meet those newly announced pleading standards.

As this Court noted in *Salahuddin*, there is a strong "jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities." 861 F.2d at 42. The District Court's orders in this case mark a striking departure from that sentiment. Despite its recognition that Plaintiff ***could*** state causes of action against the Defendants if additional facts were alleged (App.

at 15 ("Absent further facts supporting an agreement, Plaintiff's allegations fail to state a claim against Defendants for conspiring with other banks.")) , the District Court refused Plaintiff *any* opportunity to amend.  Refusing leave to amend despite recognizing that a valid claim might be stated through the allegation of additional facts certainly elevates procedure over substance.

## III.     THE DISTRICT COURT'S ORDER DISMISSING PLAINTIFF'S STATE LAW CLAIMS WITH PREJUDICE SHOULD BE REVERSED

Plaintiff's Sherman Act claims were her sole federal claims.  As described above, those claims were improperly dismissed without leave to amend. However, even had the dismissal with prejudice of Plaintiff's Sherman Act claim been proper, the District Court should not have decided the sufficiency of Plaintiff's state law claims on the basis of federal pleading rules, but instead should have declined to exercise supplemental jurisdiction over those claims so that they could be resolved in the New York state courts pursuant to the substantially different pleading standards applicable there.[5]

As the Supreme Court explained in *Carnagie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988), "Under [*United Mine Workers v. Gibbs*, 383 U.S. 715

---

[5]      Although it is not reflected in the record (because it was filed only after this appeal was taken), Plaintiff has filed a complaint in the New York Supreme Court against Citigroup, CGM, and others.

42

(1966)], a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." 484 U.S. 343, 350 (1988).

Although district courts do have discretion whether to exercise jurisdiction over state law claims, "[t]he proper scope of the district court's discretion … is not boundless." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2nd Cir. 2003). Specifically, the determination whether to exercise jurisdiction over state law claims must be exercised within the guidelines announced by the Supreme Court. Those guidelines exist because more than the district court's calendar is impacted by that decision. "The *Gibbs* Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties." *Carnegie-Mellon University*, 484 U.S. at 349-50. In this case, all of the relevant considerations should have led the District Court to conclude that exercising jurisdiction over the state law claims was improper.

Foremost among those is the fact that the District Court's order

dismissing Plaintiff's federal law claims came at the very start of the action and

before discovery even commenced.[6] *See Gibbs,* 383 U.S. at 726 ("Certainly, if

the federal claims are dismissed before trial, even though not insubstantial in a

jurisdictional sense, the state claims should be dismissed [without prejudice] as

well."); *Carnegie-Mellon University,* 484 U.S. 350 n. 7 ("[i]n the usual case in

which all federal-law claims are eliminated before trial, the balance of factors to

be considered under the pendent jurisdiction doctrine-judicial economy,

convenience, fairness, and comity-will point toward declining to exercise

jurisdiction over the remaining state-law claims").

Where dismissal of a plaintiff's federal claims occurs early in the

litigation, before trial and before discovery, it is generally an abuse of discretion

for the district court to exercise supplemental jurisdiction over pendant state law

claims. *See, e.g., Brzak v. United Nations,* 597 F.3d 107, 114 (2nd Cir. 2010)

("Because Brzak's federal claims were dismissed on jurisdictional grounds at the

very beginning of the case, there was no colorable basis for the district court to

exercise supplemental jurisdiction over her state law claim."); *Lynch v. Suffolk*

*County Police Dept., Inc.,* 348 Fed.Appx. 672, 676 (2nd Cir. 2009) (holding

---

[6] Indeed, the District Court specifically refused to permit any discovery
before it decided Defendants' motion to dismiss.   App. at 95.

44

district court abused discretion by retaining supplemental jurisdiction over state law claims after dismissing federal claim, then dismissing state law claims); *Volmar v. North Shore Hosp.*, 216 Fed. Appx. 136, 137 (2nd Cir. 2007) (remanding with instructions to district court to not exercise supplemental jurisdiction over state law claims and dismiss them without prejudice); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118 (2nd Cir. 2006) (reversing order by this District Court dismissing state law claims with prejudice on ground that district court should not have exercised supplemental jurisdiction when federal claims were dismissed at pleading stage).

Indeed, this Court of Appeal has previously directed that, where an action asserting antitrust claims under the Sherman Act is dismissed for failure to state a claim, all pendent state law claims should be dismissed without prejudice so that they may be pursued in state court. *Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1297 (2nd Cir. 1972) ("Since the federally-based claims [under the Sherman Act] were properly dismissed prior to trial, however, the pendent state claims must also be dismissed and the plaintiff relegated to the state courts for relief.").

In addition, it is improper for a district court to exercise jurisdiction over state law claims when resolution of those claims turns on unsettled questions of state law. *See Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 64 (2nd Cir. 2001)

45

(reversing district court dismissing state law claims with prejudice and ordering that they be dismissed without prejudice "because the state law claims present issues of state law that have not been clearly decided by the New York courts"). Here, the District Court expressly recognized that New York law is unsettled with respect to at least one of Plaintiff's state law claims.  App. at 31 ("New York law does not precisely define 'extreme and unfair' economic pressure" required to state claim for tortious interference with prospective economic advantage).  But, rather than dismiss that claim without prejudice so that those unsettled issues of state law may be settled by the New York courts, the District Court improperly settled the issues itself.  That was improper.  *Oliveira*, 251 F.3d at 64.

A similar analysis is applicable to Plaintiff's claims under New York's antitrust law, the Donnelly Act.  The District Court dismissed Plaintiff's state law claims on the basis of her conclusion that those claims had not been alleged in sufficient detail to satisfy ***federal*** pleading standards.  Those pleading rules are procedural, and entirely different from those that would govern an action in the New York state courts.

In particular, *Twombly* and *Iqbal* are not the law in New York.  4A N.Y.Prac., Com. Litig. in New York State Courts § 73:2 (2d ed.) (explaining that *Twombly* reflects a heightened pleading standard not applicable in New

York state court); 4B N.Y.Prac., Com. Litig. in New York State Courts § 84:14 (2d ed.) (noting that *Twombly*'s "plausibility" standard does not apply in New York).[7] Instead, because New York only requires notice pleading, a New York court would consider only whether the complaint notifies "the court and the parties of the transactions and occurrences intended to be proved and the material elements of each cause of action." *Murphy v. General Motors Corp.*,

_____

[7] Notably, several other states – even those whose rules closely track the Federal Rules of Civil Procedure – have declined to adopt the pleading standard described in *Twombly* and *Iqbal*. Thus, the Supreme Court of West Virginia noted:

> The Court notes that our interpretation of West Virginia Rule of Civil Procedure 8 is more liberal than what is allowed under the federal rules. The United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), required that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949. Thus, under the federal rules, more than a notice pleading is required insofar as a plaintiff is required to plead facts to show that the plaintiff has stated a claim entitling him to relief. Under West Virginia law, however, this Court has not adopted the more stringent pleading requirements as has been the case in federal court and all that is required by a plaintiff is "fair notice."

*Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. at 776, 461 S.E.2d at 522.

Alabama has similarly refused to abandon traditional notice pleading in favor of the standard announced in *Twombly*. *See Thomas v. Williams*, 21 So.3d 1234, 1236 n. 1 (Ala.Civ.App.2008) (refusing to apply "the more stringent standard for stating a claim in a complaint" set forth in *Twombly* on the basis that "[t]he Supreme Court of Alabama has the sole authority to promulgate rules governing practice and procedure in all Alabama courts")

47

55 A.D.2d 486, 488 (1977). In contrast to the analysis required under *Twombly*, namely, whether plaintiff's claim is plausible, New York has specifically rejected any evaluation at the pleadings stage whether the plaintiff actually has a cause of action against the defendant. *Guggenheimer v. Ginzburg*, 43 N.Y.2d 268, 275 (1977).

Under these very different pleading standards, a New York court would very likely reach a different conclusion regarding the sufficiency of Plaintiff's claims. One factor to be considered by a District Court when deciding whether to exercise supplemental jurisdiction over state law claims is "fairness to the litigatnts". *Castellano v. Board of Trustees,* 987 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers,*383 U.S. at 726). That consideration dictates that supplemental jurisdiction not be eThat consideration dictates that supplemental jurisdiction not be exercised over Plaintiff's state law claims. The District Court found no substantive bar to Plaintiff's Donnelly Act or tortuous interference claims. Rather, she found only that Plaintiff's complaint suffered from pleading deficiencies – deficiencies that could be remedied by amendment. By dismissing Plaintiff's state law claims with prejudice without affording even one opportunity to replead (n state or federal court), the District Court's decision to exercise supplemental jurisdiction deprived Plaintiff of any meaningful

48

opportunity to seek redress for the wrongs inflicted upon her. Fairness requires a different result.

Fairness, comity, and the law all require that a New York state court determine whether Plaintiff's state law claims should proceed. It was improper for the District Court to exercise jurisdiction over those claims only to dismiss them with prejudice before the case even started.

## CONCLUSION

For all of the foregoing reasons, the judgment of the District Court should be vacated. At a minimum, the District Court should be directed to dismiss Plaintiff's New York state law claims without prejudice so that they may be decided by a New York state court.

Dated:   July 21, 2010
Los Angeles, California

BROWNE WOODS GEORGE LLP
By:   /s/ Lee A. Weiss
Lee A. Weiss
lweiss@bwgfirm.com
49 West 37th Street, 15th Floor
New York, New York 10018
Tel 212.354.4901 – Fax 212.354.4904

Michael A. Bowse
mbowse@bwgfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Tel 310.274.7100 – Fax 310.275.5697

Attorneys for Appellant
Linda Grant Williams

## Certificate of Compliance with Rule 32(a)

I hereby certify that the foregoing brief complies with the type-volume limitation of Rule 32(a)(7)(B), Fed.R.App.P., because it contains 10,229 words, excluding the parties of the brief exempted by Rule 32(A)(7)(B)(iii), Fed.R.App.P. This brief complies with the typeface requirements of Rule 32(A)(5), Fed.R.App.P., and the type style requirements of Rule 32(A)(6), Fed.R.App.P., because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman style.

Dated:   July 21, 2010
Los Angeles, California

BROWNE WOODS GEORGE LLP
By:  /s/ Lee A. Weiss
     Lee A. Weiss

# DECLARATION OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is Browne Woods George LLP, 2121 Avenue of the Stars, Suite 2400, Los Angeles, CA  90067.

    On July 21, 2010, I served the foregoing document described as: **APPELLANT'S OPENING BRIEF** on the parties in this action by serving:

| | |
|---|---|
| By E-Mail and U.S. Mail:<br>Carmine D. Boccuzzi, Esq.<br>Email:  cboccuzzi@cgsh.com<br>Cleary, Gottlieb, Stein &<br>    Hamilton, LLP<br>One Liberty Plaza<br>New York, New York 10006<br>212.225.2000<br>Attorneys for Defendants Citigroup Inc. And Citigroup Global Markets Inc. | |

☒    **By serving** ☐ the original ☒ a true copy thereof as follows:

☒    **By Mail** by enclosing the document in sealed envelopes addressed as above and delivering such envelopes as follows:  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐    **By Personal Service**:  I delivered by enclosing the document in sealed envelopes addressed as above and delivering such envelopes by hand to the offices of the addressee(s).

☐    **By Federal Express**:  I delivered the envelope(s) containing the documents identified above to the Federal Express dropbox at 2121 Avenue of the Stars, Los Angeles, California 90067, on  July 7, 2010, for delivery on the next-business-day basis to the offices of the addressee(s).

☒    **By E-Mail Electronic Transmission**:  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person at the e-mail address so indicated

above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Executed on July 21, 2010, at Los Angeles, California.

☒    **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

/s/ Kathy Hall

Kathy Hall

248373_1.DOC