# 10-0538-cv

## *UNITED STATES COURT OF APPEALS*

## *FOR THE SECOND CIRCUIT*

LINDA GRANT WILLIAMS,

APPELLANT,

vs.

CITIGROUP, INC. AND CITIGROUP GLOBAL MARKETS, INC.,

APPELLEES

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 08-CV-9208-LAP/DF
Hon. Loretta A. Preska, Chief U.S.D.J.

### **APPELLANT'S REPLY BRIEF**

Lee A. Weiss
BROWNE WOODS GEORGE LLP
49 West 37th Street, 15th Floor
New York, New York 10018
Tel 212.354.4901
Fax 212.354.4904

Michael A. Bowse
BROWNE WOODS GEORGE LLP
2121 Avenue of the Stars, Ste 2400
Los Angeles, California 90067
Tel 310.274.7100
Fax 310.275.5697

Attorneys for Appellant Linda Grant Williams

1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 2

II.   ARGUMENT ...................................................................... 4

A.    The District Court Erred When It Dismissed Plaintiff's
Sherman Act §1 Claim ................................................... 4

B.    The District Court Erred When It Dismissed Plaintiff's
Sherman Act §2 Claim .................................................. 13

C.    The Alternative Grounds For Dismissal Argued by
Defendants Are Incorrect................................................ 17

1.    Plaintiff Has Standing To Sue For the Antitrust
Violations That Injured Her ................................. 17

2.    Plaintiff Is An Efficient Enforcer ......................... 21

3.    The Complaint Sufficiently Pleads The Relevant
Market .................................................................. 24

D.    Even If The Original Complaint Was Insufficient, Plaintiff
Should Have Been Permitted An Opportunity to Plead The
Purportedly Missing Facts .............................................. 26

E.    It Was Improper For The District Court To Retain
Jurisdiction Over Plaintiff's State Law Claims.............................. 32

III.  CONCLUSION................................................................... 34

**TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Apex Oil Co. v. DiMauro,*

822 F.2d 246, 254 (2nd Cir. 1987) ................................................................. 5

*Ashcroft v. Iqbal,*

129 S.Ct. 1937 (2009) ............................................................................. 4, 33

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*

472 U.S. 585 (1985) .................................................................................. 13

*Associated General Contractors of Calif. V. California State Council of*

*Carpenters,*

459 U.S. 519 (1983) .................................................................................. 21

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*

182 F.3d 1096 (9th Cir. 1999) ...................................................................... 20

*Black Box Corp. v. Avaya, Inc.,*

2008 WL 4117844, at *17 (D.N.J. Aug. 29, 2008) ........................................... 8

*Blue Shield of Virginia v. McCready,*

457 U.S. 465, 482-83 (1982) ............................................................. 19, 20, 21

**TABLE OF AUTHORITIES**
(continued)

Page

*Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*

    369 F.3d 212 (2d Cir.2004) ............................................................... 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat,*

    429 U.S. 477 (1977) ................................................................... 17, 19

*Carnegie-Mellon Univ. v. Cohill,*

    484 U.S. 343, 350 (1988) ................................................................. 32

*Chapman v. New York State Div. for Youth,*

    546 F.3d 230 (2nd Cir. 2008) ........................................................... 25

*Ciralsky v. C.I.A.,*

    355 F.3d 661 (D.C. Cir. 2004) ......................................................... 28

*Cometic Gallery, Inc. v.Schoenman Corp.,*

    495 F.3d 46 (3rd Cir. 2007) ............................................................. 30

*Crimpers Promotions, Inc. v. Home Box Office, Inc.,*

    724 F.2d 290 (2nd Cir. 1983) ....................................................... 21, 22

*Dawson Chemical Co. v. Rohm and Haas Co.,*

    448 U.S. 176 (1980) ....................................................................... 24

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Dickson v. Microsoft Corp.*,

    309 F.3d 193 (4th Cir. 2002) ................................................................ 9

*Donald v. Cook County Sheriff's Dept.*,

    95 F.3d 548 (7th Cir. 1996) ................................................................ 28

*E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc.*,

    ___ F. Supp. 2d ___, 2009 WL 2762614 at *14 (E.D. Va. Aug. 27, 2009) ... 16

*Found. For Interior Design Educ. Research v. Savannah Coll. Of Art & Design*,

    244 F.3d 521, 531 (6th Cir. 2001) ................................................................ 24

*In re Insurance Brokerage Antitrust Litig.*,

    618 F.3d 300, 323 n.22 (3rd Cir. 2010) ........................................... 4, 31

*LeBlanc v. Cleveland*,

    248 F.3d 95 (2nd Cir. 2001) ................................................................ 27

*Louisiana Wholesale Drug Co*,

    2008 WL 169362 ................................................................ 25

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*

    475 U.S. 574, 588 (1986) ................................................................ 11

**TABLE OF AUTHORITIES**
(continued)

*Monsanto Co. v. Spray-Rite Service Corp.,*

    465 U.S. 752, 764 n.9 (1084) ........................................................................ 11

*Murphy v. General Motors Corp.,*

    55 A.D.2d 486 (1977) ................................................................................... 33

*New York State Elec. And Gas Corp. v. FirstEnergy Corp.,*

    328 Fed.Appx. 13 (2nd Cir. 2009) ................................................................ 28

*Oliver Schools, Inc. v. Foley,*

    930 F.2d 248 (2d Cir. 1991) ........................................................................ 27

*Ostrofe v. H.S. Crocker Co., Inc.,*

    740 F.2d 739 (9th Cir.1984) ........................................................................ 22

*Province v. Cleveland Press Pub. Co.,*

    787 F.2d 1047 (6th Cir.1986) ...................................................................... 22

*SAS of Puerto Rico v. Puerto Rico Tel. Co.,*

    48 F.3d 39, 45 (1st Cir. 1995) ..................................................................... 24

*Starr v. Sony BMG Music Entertainment,*

    592 F.3d 314 (2nd Cir. 2010) ...........................................................2, 4, 8, 9

**TABLE OF AUTHORITIES**
(continued)

Page

*Strategic Capital Dev. Grp. V. Sigma-Tau Pharma, Inc.,*

    198 F.3d 234 (2d Cir. 1999).................................................................28

*Todd v. Exxon Corp.,*

    275 F.3d 191 (2nd Cir. 2001) ...........................................................24

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,*

    540 U.S. 398, 408-09 (2004)...............................................13, 14, 15

**Federal Statutes**

Federal Rules of Civil Procedure, Rule 12(b)(6) ....................................4

Federal Rules of Civil Procedure Rule 59(e) .......................................27

Federal Rules of Civil Procedure Rule 60(b)........................................28

## I.    INTRODUCTION

Citigroup is a monopolist.  It controls over 70% of the market for Airport Special Facility Bonds ("ASF Bonds") and further controls which other banks will be permitted to participate in ASF Bond issuances.  Plaintiff and the patent-pending structure she developed for a new type of ASF Bond threaten that monopoly.  Recognizing this, Citigroup has gone to great lengths to block Plaintiff and her structure from entering the relevant market.  It has conspired with other investment banks to boycott Plaintiff, it has coerced at least one law firm to terminate Plaintiff, and it has interfered with Plaintiff's relationships with the airlines who would benefit from Plaintiff's structure.

The District Court dismissed Plaintiff's claims, relying on much of the same reasoning it adopted (and this Court rejected) in *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2nd Cir. 2010).  Most critically, the District Court rejected Plaintiff's claims based largely on its conclusion that Citigroup's and its co-conspirators parallel conduct could be explained as independently self-interested, rather than conspiratorial, conduct.  In doing so, the District Court improperly required Plaintiff to allege facts that exclude the possibility of independent self-interested conduct.  It also overlooked several of Plaintiff's key allegations, including that the conspirators had conflicting interests regarding Plaintiff's ASF Bond structure, which would have resulted in the adoption of

that structure in the absence of a conspiracy.

Moreover, when it dismissed Plaintiff's state law claims with prejudice, the District Court failed to take proper account of the numerous decisions by this Court and the United States Supreme Court that required those state law claims to be dismissed without prejudice so that they could be resolved in state court. Although a district court certainly has discretion regarding whether or not to decide state law claims when resolving the claims that created federal jurisdiction, that discretion has limits. Here, the District Court exceeded those limits.

Even had the District Court not erred in dismissing Plaintiff's complaint, it clearly did err when it refused Plaintiff's request to amend. Although, that request to amend was made in Plaintiff's motion for reargument, there is substantial precedent in this Circuit and others for such a request. Indeed, Plaintiff's case for amendment here is particularly strong, since many of the facts that Plaintiff would allege in an amended complaint pertained to events that occurred after her original complaint was filed and which, therefore, could not have been pled previously.

## II.    ARGUMENT

### A.    The District Court Erred When It Dismissed Plaintiff's Sherman Act §1 Claim

Neither *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), nor *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), require an antitrust plaintiff to identify direct evidence of a conspiracy.  *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3rd Cir. 2010) (after *Twombly*, "a plaintiff still need not plead specific evidence" of a conspiracy).  *Twombly* itself makes clear that a plaintiff asserting claims under Section 1 of the Sherman Act need only allege facts sufficient "to *infer* an agreement." *Twombly,* 550 U.S. at 556.  In other words, "to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made." *Starr*, 592 F.3d at 321 (citations and quotations omitted).

An antitrust plaintiff can plead a conspiracy by *either* (1) direct allegations of an agreement, or (2) allegations of parallel conduct combined with sufficient "plus factors". *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 323-24 and n. 22 (3rd Cir. 2010) (analyzing *Twombly*, 550 U.S. 544). There are several such "plus factors," including: (1) that the conspirators had a common motive to conspire; (2) that the conspirators acted contrary to their

interests; and (3) facts implying a traditional conspiracy. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2nd Cir. 1987); *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d at 323-24.

Plaintiff's complaint pled parallel conduct. The Complaint described how Citigroup and its purported competitors boycotted Plaintiff and her ASF Bond structure despite the initial excitement expressed by their employees responsible for ASF Bond issuances. Complaint, ¶84, A-69. They accomplished this boycott in similar ways, including by firing or transferring employees who worked with Plaintiff to promote her structure (Complaint ¶63, A-64; Complaint ¶73, A-67) and by imposing lengthy no-call periods for ASF Bond issuances completed after they learned of Plaintiff's structure. Complaint ¶69-70, A-65-66.

The complaint also alleged facts reflecting several "plus factors." Citigroup and its bank conspirators had a motive to conspire. They each profit the secondary market for ASF Bonds, but only because of peculiarities associated with traditionally structured ASF Bonds. *See* Complaint ¶10-11, A-51-52 (Citigroup and bank conspirators earn substantial profits by trading ASF Bonds in the secondary market, but profits would disappear if Plaintiff's structure were used); Complaint ¶82, A-69. A conspiracy is necessary to ensure the preservation of those profits, since the completion of even one financing using Plaintiff's structure would require that Plaintiff's structure be employed in

11

all future ASF Bond issuances at major origin and destination airports.
Complaint ¶30, A-56 (underwriter for ASF Bond issuance must certify to the
IRS that the interest rate to be paid on bonds is fair market rate in order for
bonds to receive tax free treatment); Complaint ¶14, A-53 (once Plaintiff's ASF
Bond structure is implemented, traditionally structured ASF Bond issuances will
not continue to be entitled to tax-free status because the interest rates on those
bonds will not reflect a free market price).  This presents a significant
"prisoner's dilemma," since any bank that licenses and implements Plaintiff's
ASF Bond structure stands to earn substantial underwriting fees from doing so
(Complaint ¶51, A-61; Complaint ¶56, A-63; Complaint ¶99, A-72; Complaint
¶101, A-72), while banks that refuse to adopt Plaintiff's structure despite
adoption by another bank would lose both those underwriting fees and the
profits previously earned from trading traditionally structured ASF Bonds in the
secondary market.  Complaint ¶102, A-72.  Because of this risk, there is
substantial incentive for Citigroup and other investment banks to conspire,
rather than act independently.

Likewise, the Complaint alleges facts suggesting a traditional horizontal
conspiracy.  For example, the Complaint describes how the one bank to which
Plaintiff did succeed in licensing her ASF Bond structure was successfully
pressured by Citigroup to request termination of that license and cease

12

promoting Plaintiff's structure to airlines even though it had just entered into a 2 year license of Plaintiff's structure not long before. ¶12(d), A-52.[1]

The Complaint's allegations regarding vertical conspiracy are even more substantial. Thus, the Complaint describes an explicit agreement between Citigroup and Greenberg Traurig to disrupt Plaintiff's ability to promote her ASF Bond structure to airlines. Complaint ¶¶66-67, A-65; *infra* at 11-12.

Despite Citigroup's arguments to the contrary, these allegations establish that the conspiracy asserted in the Complaint is, at a minimum, plausible.

First, Citigroup argues that the conspiracy alleged in the original complaint is implausible on its face because it must have involved so many conspirators. Opp. Brf. at 16-17. However, that argument contradicts the complaint's allegations. Although the size of the ASF Bond market is substantial, there are very few banks who actually participate in the market. Complaint, ¶27, A-55 ("only a handful of municipal transportation bankers regularly participate in the issuance of those bonds"); Complaint, ¶29, A-56 (high barriers to entry limit the number of banks who can participate in the market). Likewise, the complaint's allegations reflect that enforcing a conspiracy among the non-bank co-conspirators is relatively straightforward.

---

[1]    In her motion for reargument, Plaintiff noted that bank employees disclosed to her that they were under pressure from other investment banks to cancel the license. A-105-106.

While the airlines are ostensibly independent actors in that market, they are completely dependent upon Citigroup and the unnamed bank conspirators for most of their corporate financing. Complaint, ¶¶74-79. Thus, Citigroup's first argument is contrary to the allegations in the complaint, which must be accepted as true here.

Second, Citigroup urges that the complaint must name the co-conspirators. Opp. Brf. at 17. The District Court dismissed Plaintiff's original complaint in part on this same assertion. Decision at 8, 10, A-13, 15. However, this Court specifically rejected that assertion in *Starr*. 592 F.3d at 325; *Black Box Corp. v. Avaya, Inc.*, 2008 WL 4117844, at *17 (D.N.J. Aug. 29, 2008) ("contrary to Avaya's contentions, the co-conspirators do not need to be identified by name"). In any event, the complaint identifies the bank conspirators are Citigroup's ostensible competitors in the market for underwriting ASF Bonds. Complaint, ¶81, A-68. Because there are only a "handful" of such banks, the complaint sufficiently informs Citigroup with whom it is alleged to have conspired. Complaint, ¶27, A-55.

Third, Citigroup argues (as the District Court did both here and in *Starr*) that the conspiracy allegations are not plausible because Citigroup and its co-conspirators had economic incentives to resist Plaintiff and her ASF Bond

structure. Opp. Brf. At 17-18; Decision at 11, A-16 (citing and quoting lower court opinion in *Starr v. Sony BMG Entertainment*).

This argument must fail for several reasons. First, as this Court made clear when it reversed the District Court in *Starr,* an antitrust plaintiff is not required to allege facts that exclude the possibility of independent self-interested conduct. *Starr*, 592 F.3d at 325. Rather, it is enough that the complaint contains allegations sufficient to suggest that an agreement was made. *Id.* As described above, those facts are pled in the original complaint.

Second, a conspiracy among these banks is plausible precisely because of this shared economic incentive. Although there is no requirement that the members of an anticompetitive conspiracy share the same economic motivation or goals (*Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002)), that the bank co-conspirators shared Citigroup's motivation to exclude Plaintiff and her ASF Bond structure from the market makes the existence of the conspiracy alleged in the original complaint more, not less plausible. Because of the significant "prisoner's dilemma" problem discussed above (*supra* at 5-6), Citigroup's and the bank co-conspirators' economic self-interests, in fact, give them a substantial incentive to conspire, rather than act independently.

Citigroup also attempts to characterize the bank-airline vertical conspiracy as implausible. According to Citigroup, because the airlines play a role in the

15

selection of the banks who will participate in underwriting a particular ASF Bond issuance, it must follow that they have power over Citigroup and the bank co-conspirators that would allow them to refuse to participate in a boycott of Plaintiff and her ASF Bond structure. Opp. Brf. at 20. However, the complaint alleges facts reflecting that airlines' ability to decide which bank will lead a particular ASF Bond issuance has nothing to do with their ability to refuse Defendants' and their bank conspirators' demands for a boycott of Plaintiff. The airlines are utterly dependent upon Citigroup and the bank conspirators for operating capital. Complaint, ¶¶76-78, A-68. If the airlines were cut off from that flow of capital by Citigroup and the bank conspirators, they would be unable to operate. Complaint, ¶¶78, A-68. In contrast, if the airlines refused to permit a particular bank to underwrite an ASF Bond issuance, the underwriting fees that would be lost to that bank, while substantial, are dwarfed by other profit centers, including the secondary market for ASF Bonds. Complaint, ¶56, A-63. Thus, the power Citigroup and the bank conspirators hold over the airlines give them far greater coercive control over the airlines than the airlines have over Citigroup and the bank conspirators. Accordingly, it is perfectly plausible that the airlines have participated in the boycott of Plaintiff even though doing so is against their apparent economic self-interest.

16

Fifth, Citigroup argues that Plaintiff's allegations concerning a vertical conspiracy between Citigroup and Plaintiff's former law firm fail because those allegations only reflect demands made by Citigroup followed by compliance by Plaintiffs' former law firm. Opp. at 21. In her opening brief, Plaintiff noted that, before terminating her as Citigroup demanded, Greenberg Traurig instructed Plaintiff to stop marketing her ASF Bond structure. Opening Brf. at 35. Citigroup argues that this allegation is insufficient because it, too, merely shows pressure and acquiescence by Greenberg, rather than a conspiratorial agreement. Opp. Brf. at 21. However, that allegation shows much more. In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 n.9 (1084), the Supreme Court held that mere complaints by a manufacturer, followed by conformance to a suggested price by a distributor is insufficient to indicate a conspiracy. But, it also noted that other "direct or circumstantial evidence" of "a conscious commitment to a common scheme designed to achieve an unlawful objective," when combined with complaints and acquiescence, is sufficient to make out a claim under Section 1. *Id.* at 764 (quotations and citations omitted). As the Court later explained in *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986), the purpose of this requirement is to insure that the Plaintiff offers facts that tend to exclude the possibility that the alleged vertical conspirators were acting independently. Greenberg Traurig's refusal to

17

allow Plaintiff to market her ASF Bond structure before it terminated her shows

a common commitment to achieve an unlawful objective because it tends to

exclude the possibility that Greenberg Traurig was acting independently.

Greenberg Traurig had no independent business reason to instruct Plaintiff to

stop marketing her ASF Bond structure. That instruction was contrary to the

terms of Plaintiff's hiring by Greenberg Traurig (which required her to promote

her ASF Bond structure) and contrary to Greenberg Traurig's economic self-

interest (since Greenberg Traurig stood to collect legal fees if Plaintiff's ASF

Bond structure was implemented). Complaint ¶66, A-65. That Greenberg

abruptly changed its attitude towards Plaintiff's promotion of her ASF Bond

structure in contravention of its own economic self-interest after Citigroup

demanded that the firm block Plaintiff from promoting her structure reflects that

the effort to block Plaintiff from promoting her structure was the result of a tacit

or explicit agreement, rather than independent, non-conspiratorial conduct.

    In sum, the original complaint adequately alleged a plausible antitrust

conspiracy. The District Court's decision to dismiss Plaintiff's complaint

without leave to amend was in error and should be reversed.

**B.     The District Court Erred When It Dismissed Plaintiff's Sherman Act §2 Claim**

With respect to Plaintiff's monopolization claim under the Sherman Act Section 2, Citigroup argues that its refusal to deal with Plaintiff can only violate the law if Citigroup previously used Plaintiff's ASF Bond structure before subsequently refusing to use it.  Opp. Brf. at 22.

Citigroup's argument is wrong in two respects.  First, Citigroup incorrectly assumes that it must have previously implemented Plaintiff's patent-pending ASF Bond structure in order for Plaintiff to make out a Section 2 claim on the basis of a unilateral refusal to deal. *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 408-09 (2004), relied upon by Citigroup, held that a unilateral refusal to deal could violate Section 2 if the defendant's refusal terminated a prior, voluntary course of dealing. *Id.* at 409. The Court did not, however, hold that a unilateral refusal to deal is unlawful only if it is terminates a prior course of dealing between the parties.  Rather, the court noted that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 408.  The Court then described its earlier holding in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), as reflecting *one* such set of circumstances.  540

19

U.S. at 408-09. Indeed, the Court even indicated later in its opinion that other circumstances could justify finding a Section 2 violation in the context of a unilateral refusal to deal. *Id.* at 411 ("we do not believe that traditional antitrust principles justify adding the present case to the *few* existing exceptions from the proposition that there is no duty to aid competitors.")

For example, the *Trinko* court indicated that evidence reflecting there ***would have been*** a course of dealing under ordinary circumstances will suffice: "The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, ***or would ever have done so absent statutory compulsion.***" *Id.* at 409 (emphasis added). This, combined with the Court's explanation that the termination of a prior course of dealing renders a unilateral refusal to deal unlawful because it "suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end" (*Id.*), indicates a unilateral refusal to deal violates Section 2 when (1) the defendant monopolist engaged in a unilateral refusal to deal, (2) that refusal to deal sacrificed short term profits, and (3) the defendant's refusal to deal terminates a prior course of dealing or refuses a course of dealing that the facts indicate would have occurred but for some anticompetitive purpose.

Alternatively, to the extent a prior course of dealing between Plaintiff and Citigroup is required to state a claim, *Trinko* reflects that prior course of dealing

need not consist of the actual implementation of Plaintiff's structure. Rather, it is enough that the parties were engaged in a prior course of dealing that would have resulted in the implementation of Plaintiff's ASF Bond structure and that the implementation of Plaintiff' ASF Bond structure would have resulted in income to Citigroup. Plaintiff has alleged each of these things. *See* Complaint, ¶51, A-61 (CGM executives excited at prospect of implementing structure); Complaint, ¶56, A-63 (CGM would have earned substantial underwriting fees by refinancing existing, higher interest rate bonds with new, low interest rate bonds using Plaintiff' structure); Complaint, ¶63, A-64 (Defendants prohibited their own employees from promoting Plaintiff's ASF Bond structure)

Thus, far from rendering Plaintiff's Section 2 claims inadequate, *Trinko* reflects that Plaintiff here has alleged sufficient facts to state a claim based on Citigroup's unilateral refusal to deal.

Defendants' argument that Plaintiff has abandoned other aspects of her Section 2 claim, including her conspiracy to monopolize claim based upon cooperative exclusionary conduct by Defendants and bank conspirators (Opp.Brf. at 23 n.9), is nonsensical. Plaintiff specifically addressed that aspect of her Section 2 claim in her briefs below and in her opening brief here. For example, Plaintiff explained that her allegation that Defendants' and the bank conspirators' imposition of unusually lengthy no-call periods on ASF Bonds

21

issued after they learned of Plaintiff's ASF Bond structure created a claim under Section 2. *See* Complaint, ¶12(g), A-53; Complaint ¶69, A-65-66; Opening Brf. at 20 n.2 (citing *E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc.*, ___ F. Supp. 2d ___, 2009 WL 2762614 at *14 (E.D. Va. Aug. 27, 2009) for proposition that Section 2 claim is sufficiently pled where defendant with market power entered into long-term supply agreements whose purpose and effect was to preclude plaintiff from entering the market). These allegations are not conclusory as Citigroup asserts. On the contrary, they are extremely specific. *See, e.g.,* Complaint ¶69, A-65-66 (11 year no call period imposed on bond for American Airlines' terminal at JFK); Complaint ¶70, A-66 (unusually lengthy no call periods imposed on bonds for American Airlines' terminals at Chicago O'Hare and Dallas Fort Worth, and United Airlines terminal at Denver International Airport); *id.* (purpose of long no call periods was to erect barriers to Plaintiff's entry by preventing Plaintiff's structure from being used to refinance bonds).

Thus, the original complaint adequately alleged a claim under Section 2 of the Sherman Act. The order dismissing that claim was improper.

22

**C.    The Alternative Grounds For Dismissal Argued by Defendants Are Incorrect**

**1.    Plaintiff Has Standing To Sue For the Antitrust Violations That Injured Her**

Defendants first attempt to backstop the District Court's erroneous dismissal of Plaintiff's federal antitrust claims by converting the "antitrust injury" requirement into a doctrine that prohibits suits by excluded market participants. That is simply not the law.

The concept of antitrust injury originates from the Supreme Court's decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977). In *Brunswick* an owner of a bowling center sued a bowling equipment manufacturer, asserting that it had unlawfully monopolized the area market for bowling centers by purchasing numerous of plaintiff's competitors. The Supreme Court held that plaintiff's claims could not be maintained under the antitrust laws because defendant's purchases of faltering bowling centers had preserved, rather than suppressed, competition, and because the damages plaintiff sought to recover were based on losses it suffered as a result of the *increase* in competition caused by the survival of those competing bowling centers rather than on a restraint of competition. *Id.* at 488. The Supreme Court determined that suits for this kind of injury (i.e., injury caused by increased

23

competition) were incompatible with the purposes of the antitrust laws, which

purpose is to *increase* competition. *Id.* As a result, the Court announced a new

"antitrust injury" requirement:

> The injury should reflect the anticompetitive effect
> either of the violation or of anticompetitive acts made
> possible by the violation. It should, in short, be the
> type of loss that the claimed violations would be likely
> to cause.

*Id.* at 489.

To establish antitrust injury, "a plaintiff must show (1) injury-in-fact; (2)

that has been caused by the violation; and (3) that is the type of injury

contemplated by the statute." *Blue Tree Hotels Inv., Ltd. v. Starwood Hotels &*

*Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir.2004). There is no question

that Plaintiff here alleged sufficient facts to satisfy these requirements.

Plaintiff alleged that she suffered injury in fact and that her injuries were

caused by Defendants' violations of the antitrust laws. *See* Complaint ¶13, A-

53; *see also id.* at ¶¶87, 96, 106, 112, 118, 124, A-70-76 ("As a result of

Defendants' and the Unnamed Bank Conspirators' conduct and conspiracy,

Plaintiff has also suffered and continues to suffer injuries. Among other things,

no ASF Bonds have been issued using Plaintiff's patent pending bankruptcy

remote SPE structure, causing Plaintiff to lose licensing and other fees she would have earned.")

Defendants would limit the class of plaintiffs who can satisfy the third component of the antitrust injury requirement to those who were forced to pay higher prices because of diminished competition (*i.e.*, consumers of the product in the restrained market). However, the Supreme Court has expressly rejected that narrow reading of *Brunswick*. In *Blue Shield of Virginia v. McCready*, the Court ruled that "while an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress, that is not the only form of injury remediable under §4." 457 U.S. 465, 482-83 (1982)  There, a health plan subscriber sued her health plan for conspiring with a psychiatrist trade group to exclude psychologists from the Virginia mental health market by refusing to reimburse subscribers for mental health treatment obtained through psychologists, rather than psychiatrists. Because the refusal to reimburse plaintiffs and other subscribers was the means by which the illegal ends were to be achieved, subscribers had standing to sue. *Id.* at 479 ("Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. .... Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but

25

that the loss was precisely the type of loss that the claimed violations ... would be likely to cause."). Thus, where an antitrust plaintiff's injuries are a necessary step in the anticompetitive scheme alleged, they satisfy the "antitrust injury" requirement. *Id.* at 483-84 ("Although McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market.")

Defendants' exclusion of Plaintiff from the relevant market was critical to the success of their anticompetitive scheme. Had Plaintiff been able to introduce her bond structure to the market, Defendants' bonds would have faced significant price competition and Defendants would have been unable to maintain their monopoly over the ASF bond market. As the target of a group boycott, Plaintiff certainly has suffered antitrust injury and has antitrust standing. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) ("Plaintiffs are all non-members of the Resort Association and thus suffer an antitrust injury as the direct targets of the boycott.") Indeed, this is made clear by an example used by the Supreme Court in *Blue Shield of Virginia*: "If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions." 457 U.S. 484 n.21. In

26

other words, as the target of the boycotting conduct, Plaintiff has standing to pursue antitrust claims based upon that boycotting conduct, even though the ultimate purpose and effect of the boycott is to effect prices paid by someone other than Plaintiff.

### 2.    Plaintiff Is An Efficient Enforcer

Defendants' argument that Plaintiff is not an "efficient enforcer" of the antitrust laws is meritless.

First, Defendants argue that only Citigroup's customers or competitors could be efficient enforcers. However, that simply is not the law. The Supreme Court has made clear that being a consumer or competitor of the defendant is *not* a requirement for antitrust standing. *See Blue Shield of Virginia*, 457 U.S. 484 n.21; *see also Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2nd Cir. 1983) (rejecting argument that *Associated General Contractors* imposed such a requirement and holding that boycotted plaintiff who was neither competitor nor consumer had standing to sue). On the contrary, a plaintiff may establish antitrust injury *either* (1) by proof that she was a consumer or competitor in the relevant market, *or* (2) by showing that her injury was "inextricably intertwined" with the injury to competition, in that the plaintiff was "manipulated or utilized by defendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and

geographic market." *Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047, 1052 (6th Cir.1986); *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 745-46 (9th Cir.1984) (though neither a consumer nor competitor in the relevant market, plaintiff who was a necessary means to achieve conspirators' illegal end suffered antitrust injury).

This Court has also rejected the notion that only competitors and consumers have standing to sue under the antitrust laws, and recognizes that the target of a boycott has antitrust standing. In *Crimpers Promotions*, this Court held that a trade show organizer had standing to sue two cable television companies for their successful efforts to coerce other cable television companies and programming suppliers to boycott the organizer's trade show, even though the trade show organizer was neither a competitor nor a customer of the defendants. 724 F.2d 290. In reaching that conclusion, the Court specifically rejected Defendants' assertion that only competitors and consumers have standing:

> we are unconvinced that the victim of a
>
> successful boycott designed to support a broad policy
>
> of market limitation lacks standing under § 4 simply
>
> because the boycottee was not a buyer or a seller but
>
> was endeavoring to provide a method whereby buyers

and sellers could deal effectively with each other

without paying tribute to the defendants. The contrary

view would run counter not only to the two most

recent decisions of the Supreme Court but to

elementary common sense.

*Id.* at 297.

Plaintiff in this case was the means by which Defendants accomplished

their anticompetitive goals.  It was only by preventing Plaintiff from

participating in the relevant market that Defendants could prevent superior, price

competitive ASF Bonds from entering the market.

Defendants' second argument is no more persuasive.  None of the four

*Paycom* factors weighs against finding that Plaintiff is an efficient enforcer.

First, Plaintiff's injury is a direct product of Defendants' anticompetitive

conduct; indeed, like the hypothetical bank in *McCready*, Plaintiff is the

immediate *target* (fulcrum) of Defendants' conduct.  Second, although

Defendants suggest that airlines' self-interest would motivate them to bring these

claims, the Complaint alleges that Defendants and their co-conspirators have

coercive power over the airlines, which not only would make the airlines

unlikely to sue for the antitrust violation, but was actually used to coerce the

airlines to participate in the violation.  *See* Complaint ¶¶75-79, A-67-68.  Where

29

other potentially "efficient enforcers" lack the ability or incentive to sue, a court must look to the next potential plaintiff with an incentive to sue. *See, e.g., SAS of Puerto Rico v. Puerto Rico Tel. Co.,* 48 F.3d 39, 45 (1st Cir. 1995). The third and fourth factors also reflect that Plaintiff is an efficient enforcer. Plaintiff's injuries consist of her loss of licensing and other fees she would have collected through the use of her proprietary structure for ASF Bonds. *See* Complaint ¶¶87, 96, 106, 112, 118, 124. That injury is not speculative and indicates no problem of apportionment. The owner of a unique idea is entitled to demand fees for the licensing of that idea. *Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 215 (1980) ("the essence of a patent grant is the right to exclude others from profiting by the patented invention.").

Defendants' analyses are wrong. As the fulcrum of Defendants' anticompetitive efforts, Plaintiff certainly has antitrust standing.

### 3. The Complaint Sufficiently Pleads The Relevant Market

Challenges to the relevant market definition contained in an antitrust complaint are typically not appropriate on a motion to dismiss. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2nd Cir. 2001). This is because determining an appropriate market definition "is a deeply fact-intensive inquiry" that usually requires discovery. *Id.*; *Found. For Interior Design Educ. Research v. Savannah Coll. Of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001). It is enough

30

that Plaintiff's relevant market is plausible. *Louisiana Wholesale Drug Co*, 2008 WL 169362, at *7. There is nothing patently implausible about the relevant market as Plaintiff has defined it.

Plaintiff defines the relevant market as "the market for originating and refinancing ASF Bond issuances for the purpose of financing and refinancing construction and renovation of air passenger terminals at major hub airports in the United States." Complaint ¶26, A-55. Plaintiff has defined that market by reference to the rules of reasonable interchangeability and cross-elasticity of demand. *See Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2nd Cir. 2008) (the "alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand").

Constructing and renovating passenger terminals at major airports is expensive, requiring municipalities to make arrangements to attract airlines to those airports. Complaint ¶2, A-49. Although municipalities could finance the construction and renovation themselves through bond issuances on which they are the obligors, such bonds are poor substitutes for ASF Bonds because the issuance of construction or renovation bonds by municipalities directly create liability for the municipal entity and thereby reduced borrowing for other projects. *Id.* ¶54, A-62. Likewise, although airlines could theoretically finance

31

construction and renovation through ordinary corporate bonds bearing taxable

interest, their credit ratings make the costs of such borrowing cost-prohibitive.

*Id.* Thus, ordinary municipal bonds and ordinary corporate bonds are not

interchangeable for ASF Bonds.

Although Defendants might contend that products other than ASF Bonds

should be included in the relevant market, the parties' dispute over that issue

simply cannot be resolved on a motion to dismiss without the benefit of

evidence. Plaintiff has alleged facts sufficient to make her proposed relevant

market at least plausible. Nothing more is required at this stage of the litigation.

**D.    Even If The Original Complaint Was Insufficient, Plaintiff**

**Should Have Been Permitted An Opportunity to Plead The**

**Purportedly Missing Facts**

Citigroup's principal argument why it was proper for the District Court to

dismiss Plaintiff's original complaint without permitting Plaintiff to amend  is

that Plaintiff did not explicitly request leave to amend when opposing

Citigroup's motion to dismiss. In making that argument, Citigroup

conspicuously ignores the several decisions of this Court holding that leave to

amend should be permitted even where it has never been requested, and that it

certainly should be permitted when requested in the context of a motion for

reargument.

This Court has held that leave to amend should have been granted even when no request to amend was expressly made by the plaintiff. Thus, in *Oliver Schools, Inc. v. Foley*, this Court held that plaintiff should have been permitted to replead even though he "never asked for leave to amend the complaint". 930 F.2d 248, 253 (2d Cir. 1991). There, the Court found that it was enough that the plaintiff's ability to cure the deficiencies in its original complaint was understood. *Id.* In this case, the District Court's opinion makes clear that the Court knew or believed Plaintiff could state claims for relief by alleging "further" facts. App. at 15. Given this, the District Court should have allowed Plaintiff at least one opportunity to resolve any perceived pleading deficiencies.

Moreover, even if a formal request to amend is required, this Court has repeatedly held that a request to amend made in a motion for reconsideration or reargument satisfies the requirement. Thus, in *LeBlanc v. Cleveland*, the Court held that the district court abused its discretion in denying plaintiff's Rule 60 motion to vacate the judgment entered against her so that the complaint could be amended to dismiss a non-diverse party in order to create federal jurisdiction over plaintiff's claims. 248 F.3d 95 (2nd Cir. 2001). Similarly, in *New York State Elec. And Gas Corp. v. FirstEnergy Corp.*, this Court found that plaintiff's request for leave to amend, made for the first time in its Rule 59(e) motion for reargument, was sufficient to trigger the liberal rules requiring that leave to

33

replead ordinarily be granted.  328 Fed.Appx. 13, 14 (2ⁿᵈ Cir. 2009); *see also*

*Strategic Capital Dev. Grp. V. Sigma-Tau Pharma, Inc.,* 198 F.3d 234 (2d Cir.

1999) (reversing order denying request to replead made in motion for

reargument under Fed. R. Civ. Proc. 60(b)).[2]  Plaintiff properly relied on that

precedent.

Citigroup argues that an amended complaint cannot be filed after

dismissal unless reconsideration or reargument is first granted.  Opp. Brf. at 39-

40.  That argument ignores, however, that the precedents described above

necessarily required that the district court grant the motion for reconsideration or

reargument solely on the basis of the request for leave to amend.

Citigroup's argument also ignores that Plaintiff has offered compelling

grounds for reconsideration.

First, there was a substantial change (or, at least, clarification) in the law

after Plaintiff filed her original complaint and after she opposed Citigroup's

motion to dismiss, and that change factored heavily in the District Court's

dismissal of several of Plaintiff's claims.  It was *Iqbal* that applied the

"plausibility" standard to Plaintiff's claims under Section 2 of the Sherman Act

---

[2]    Other circuits have similarly concluded that a request to amend
may be made in connection with a post-dismissal motion to reargue or for
reconsideration. *Ciralsky v. C.I.A.*, 355 F.3d 661, 674 (D.C. Cir. 2004); *Donald
v. Cook County Sheriff's Dept.*, 95 F.3d 548 (7ᵗʰ Cir. 1996).

and led to the dismissal of those claims. *See* Order of Dismissal at 17, n.5, A-22 ("Plaintiff initially argues that the standard set forth in *Twombly* does not apply to her Section 2 claim. Under *Iqbal*, this argument fails.").

Second, Plaintiff's motion for rehearing supplied substantial factual grounds for vacating the judgment. First, several of the facts the District Court believed were lacking from Plaintiff's allegations actually were pled in the complaint. Opening Brf. at 31-36. Second, the motion offered numerous new facts that resolved any perceived pleading deficiencies. The District Court never even considered whether those newly proffered facts were sufficient. Instead, it erroneously rejected them on the sole (and incorrect) ground that they were known to Plaintiff previously and, as a result, could not form the basis of a motion for reconsideration. A-44. In fact, numerous of those events did not even occur until after the briefing on Citigroup's motion to dismiss was completed and, therefore, could not possibly have been raised by Plaintiff as a basis for amendment when she opposed Citigroup's motion. Opening Brf. at 38-40. Those new facts unquestionably fill any gaps in the original complaint and demonstrate that the conspiracy alleged by Plaintiff is at least plausible. Although Citigroup argues that the new facts are insufficient to make out a plausible conspiracy claim, it ignores that the new facts must be read together with the allegations already pled.

35

Thus, that J.P. Morgan Securities refused to meet with Plaintiff in May 2009 regarding the use of her structure despite the fact that J.P. Morgan's client requested the meeting, may not reflect a conspiracy by itself. App. at 105, ¶28. However, that reflects additional parallel conduct (refusing to deal with Plaintiff) by another bank conspirator and an additional "plus factor" (since JP Morgan's refusal of its client's request is facially illogical).

Jeff Holt's October 2009 declaration that no industry participant would allow Plaintiff to get "any traction" also indicates a conspiracy. App at 106, ¶29. By indicating knowledge that other industry participants would block the implementation of Plaintiff's structure, Mr. Holt implicitly recognized the existence of an agreement. *Cometic Gallery, Inc. v. Schoenman Corp.*, 495 F.3d 46, 52 (3rd Cir. 2007) (identifying statement by competitor that if plaintiff went into business, competitors would stop plaintiff as "direct" evidence of conspiracy).

Barclays Capital's mid-2009 threat to bankers at another investment bank that they would be blackballed by Defendants from working at any major investment bank if they cooperated with Plaintiff is also direct evidence of conspiracy. At a minimum, this reflects prior knowledge of what those banks will do, suggesting an agreement regarding how those banks would react to a request to participate in an underwriting of ASF Bonds issued using Plaintiff's

36

structure.  App. at 106-107, ¶¶30-31.

Finally, while the October 29, 2009 revelation of a conspiracy by

Citigroup and others to restrain trade in the municipal bond market (App. at 107-

112, ¶¶33-45; App. at 117, ¶2) may not be enough standing alone to prove a

conspiracy in the ASF Bond market, it at least reflects a willingness and

opportunity by Citigroup and the bank conspirators to enter into an

anticompetitive agreement.  This, in turn, makes the existence of a scheme to

restrain trade in the ASF Bond market plausible.  *In re Insurance Brokerage*

*Antitrust Litig.*, 618 F.3d at 336-41 (allegations reflecting bid rigging by

defendants in transactions other than those at issue in action satisfied *Twombly*'s

plausibility requirement for claim of broader horizontal conspiracy affecting

transactions at issue in action).

To the extent Citigroup's contention that the local rules of the District

Court permitted the District Court to disregard the declaration filed in support of

Plaintiff's motion for reconsideration and reargument, that argument is baseless.

Even assuming the District Court could have stricken that declaration and

thereby ignored it, the court did not strike the declaration.  Accordingly, that

declaration was a part of the record before the District Court and is a part of the

record here.  It is properly considered.

For all of these reasons, even if this Court were to conclude that the

37

original complaint was somehow deficient, at a minimum, Plaintiff's request to replead must be granted.

**E.    It Was Improper For The District Court To Retain Jurisdiction Over Plaintiff's State Law Claims**

The final issue on this appeal is whether the District Court erred when it exercised jurisdiction over Plaintiff's supplemental state law claims merely to dismiss them with prejudice, rather than permitting them to be resolved by the New York state courts.

Several factors control whether a district court should exercise supplemental jurisdiction over state law claims after eliminating the claims that create federal jurisdiction. Among those factors are fairness and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both of those factors weigh heavily against the exercise of supplemental jurisdiction here.

Fairness dictates that Plaintiff be permitted to pursue her state law claims in the New York courts. Based upon a relatively new *federal* pleading standard, Plaintiff's Donnelly Act claims were dismissed with prejudice solely on the ground that her initial complaint failed to allege sufficient facts to state a claim under the federal pleading rules. No judge or jury has ever even considered whether Plaintiff's Donnelly Act claims are meritorious. Plaintiff has not been permitted an opportunity to prove those claims. Indeed, Plaintiff has not even

38

been permitted to amend her complaint to have its sufficiency measured after it includes all of the additional facts identified in Plaintiff's motion for rehearing.

Plaintiff's Donnelly Act claims would have survived a motion to dismiss in the New York Supreme Court. *Twombly* and *Iqbal* are not the law in New York. Opening Brf. At 46-47. In New York, a complaint is sufficient if it notifies "the court and the parties of the transactions and occurrences intended to be proved and the material elements of each cause of action." *Murphy v. General Motors Corp.*, 55 A.D.2d 486, 488 (1977). It would be fundamentally unfair to foreclose Plaintiff from pursuing New York state law claims on the basis of a complaint that would have been sufficient in state court.

Comity similarly dictates that Plaintiff's state law claims be resolved by the New York state courts. New York plainly has an interest in enforcing its own antitrust laws pursuant to its own set of rules for doing so. That interest is heightened here, since Plaintiff and the Defendants are all residents and citizens of New York. Complaint ¶¶20-22, A-54.

Because two of the four factors pertinent to these issues, as well as the general presumption against exercising supplemental jurisdiction (Opening Brf. At 42-45), all weigh against exercising supplemental jurisdiction over Plaintiff's state law, the District Court erred when it failed to order remand of Plaintiff's

state law claims and instead dismissed them with prejudice and without leave to amend.

## III.    CONCLUSION

For each of the foregoing reasons, Plaintiff should be permitted to proceed on the basis of her original allegations or, at a minimum, should be allowed to amend her complaint to include allegations regarding events that occurred after he filed her original complaint.  Baring all else, Plaintiff should be  should be permitted to pursue her important state law claims in state court.


Dated:  January 10, 2011
Los Angeles, California

                                          BROWNE WOODS GEORGE LLP
                                          By:  /s/ Michael A. Bowse
                                          Michael A. Bowse
                                          mbowse@bwgfirm.com
                                          2121 Avenue of the Stars, Suite 2400
                                          Los Angeles, California 90067
                                          Tel 310.274.7100 – Fax 310.275.5697

BROWNE WOODS GEORGE LLP
By:  /s/ Michael A. Bowse
Michael A. Bowse
mbowse@bwgfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Tel 310.274.7100 – Fax 310.275.5697

Lee A. Weiss
lweiss@bwgfirm.com
49 West 37th Street, 15th Floor
New York, New York 10018
Tel 212.354.4901 – Fax 212.354.4904


Attorneys for Appellant
Linda Grant Williams

## Certificate of Compliance with Rule 32(a)

I hereby certify that the foregoing brief complies with the type-volume limitation of Rule 32(a)(7)(B), Fed.R.App.P., because it contains 6,980 words, excluding the parties of the brief exempted by Rule 32(A)(7)(B)(iii), Fed.R.App.P. This brief complies with the typeface requirements of Rule 32(A)(5), Fed.R.App.P., and the type style requirements of Rule 32(A)(6), Fed.R.App.P., because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman style.

Dated:  January 10, 2011
Los Angeles, California

BROWNE WOODS GEORGE LLP

By:  /s/ Michael A. Bowse
        Michael A. Bowse

# DECLARATION OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is Browne Woods George LLP, 2121 Avenue of the Stars, Suite 2400, Los Angeles, CA 90067.

On January 10, 2011, I served the foregoing document described as: **APPELLANT'S REPLY BRIEF** on the parties in this action by serving:

| | |
|---|---|
| Carmine D. Boccuzzi, Esq.<br>Cleary, Gottlieb, Stein & Hamilton, LLP<br>One Liberty Plaza<br>New York, New York 10006<br>212.225.2000<br>Email: cboccuzzi@cgsh.com<br>Attorneys for Defendants Citigroup Inc. And<br>Citigroup Global Markets Inc. | |

☒ **By serving** ☐ the original ☒ a true copy thereof as follows:

☒ **By Mail** by enclosing the document in sealed envelopes addressed as above and delivering such envelopes as follows: I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ **By E-Mail Electronic Transmission**: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person at the e-mail address so indicated above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Executed on January 10, 2011, at Los Angeles, California.

☒ **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

/s/ Kathy Hall
Kathy Hall          267792_1.DOC

1